**FLORIDA POWER & LIGHT COMPANY, Appellee,**

v.

**WESTINGHOUSE ELECTRIC CORPORATION, Appellant.**

No. 77–2448.

United States Court of Appeals, Fourth Circuit.

Argued Jan. 12, 1978.

Decided June 30, 1978.

John S. Battle, Jr., Richmond, Va. (McGuire, Woods & Battle, Richmond, Va., Robert F. Pugliese, Pittsburgh, Pa., William R. Jentes, Kirkland & Ellis, Chicago, Ill.,

Alan G. Greer, Sherryll Martens Dunaj, Frates, Floyd Pearson, Steward, Richman & Greer, Miami, Fla., on brief), for appellant.

Alvin B. Davis, Miami, Fla. (Dwight Sullivan, Paul J. Bonavia, Steel Hector & Davis, Miami, Fla., on brief) for appellee.

Before RUSSELL and WIDENER, Circuit Judges, and YOUNG, District Judge.[*]

DONALD RUSSELL, Circuit Judge:

In this action for breach of contract, defendant Westinghouse Electric Corporation (Westinghouse) appeals from an order of the District Court to strike certain of Westinghouse's defenses insofar as those defenses relate to § 2–615 of the Uniform Commercial Code (U.C.C.) (Fla.Stat. § 672.615).[1]

In 1966 the parties to this action entered into two contracts—a Plant Equipment Contract and a Fuel Contract. The effective date of both contracts was stated as November 15, 1965. Under the equipment contract, Westinghouse agreed to furnish Florida Power and Light (FPL) with the capital equipment necessary to construct a nuclear power plant in Dade County, Florida; the fuel contract provided for the supply of nuclear fuel to this plant. The fuel contract also contained a provision whereby FPL was given "purchase options" concerning the fuel to be furnished to the first nuclear plant. Under this provision, FPL was given the option until "initial criticality" (stated to be no sooner than January, 1970) to select one of three proffered arrangements for the purchase of fuel.[2]

---

[*] Joseph H. Young, United States District Judge, District of Maryland, sitting by designation.

1. Florida Statute § 672.615 (excuse by failure of presupposed conditions) provides, in pertinent part:

"Except so far as a seller may have assumed a greater obligation and subject to the preceding section on substituted performance:
(a) Delay in delivery or nondelivery in whole or in part by a seller who complies with paragraphs [b] and [c] is not a breach of his duty under a contract for sale if performance as agreed has been made impracticable by the occurrence of a contingency the nonoc-

currence of which was a basic assumption on which the contract was made . . . ."

2. These purchase options are set out in detail in the 1966 fuel contract itself, but the preamble to that contract sufficiently illustrates the context in which these options were viewed by the parties:

"Florida proposes to construct and operate two large nuclear power plants at its Turkey Point site. This Contract evidences Florida's willingness to purchase and the willingness of Westinghouse to sell fuel for the first plant . . . . Florida shall have the option until initial criticality (a) to purchase the first core fuel loading and replacement regions to enable five years of operation at lump-sum

However, FPL was under a binding obligation to purchase fuel; it did not have the option of choosing none of the three alternative arrangements. FPL duly made its selection in August, 1972.

The equipment and fuel contracts also extended to FPL options, exercisable until July, 1967, to purchase equipment and nuclear fuel for a second plant at the same site as the first.[3] FPL exercised these options in February, 1967.

In June, 1965, prior to the formation of the first fuel contract, the Florida U.C.C. was enacted with the provision that it would become effective on January 1, 1967 —subsequent to the formation of the first fuel contract but prior to FPL's election of a fuel service arrangement under that contract and prior to FPL's exercise of its option to enter into a second fuel contract.

In September, 1975, Westinghouse notified FPL that, because performance of the fuel contracts had become commercially impracticable, U.C.C. § 2–615 excused Westinghouse from complete performance of those contracts. Following FPL's rejection of its uranium allocation offer, Westinghouse declared the contracts terminated. FPL then brought the present diversity action against Westinghouse seeking, in essence, specific performance of the contracts or damages for their breach.[4] In answering the complaint, Westinghouse raised certain affirmative defenses based upon excuse by reason of failure of presupposed conditions (commercial impracticability), as provided in U.C.C. § 2–615.

FPL moved to strike these defenses on the ground that the U.C.C. did not apply to the fuel contracts in issue because they were formed prior to the Code's effective date. The District Court agreed, ordering in September, 1977 that these defenses be stricken insofar as they related to § 2–615. The order was accompanied by a ruling from the bench in which the Court stated, in part, that "Westinghouse cannot claim the benefit of a statute which was enacted after the date of the contract. Case law and policy would seem to dictate that the Code should not apply retroactively to contracts entered into before the effective date of the Code." The Court reasoned that since both the fuel contract for the first plant and the option for a fuel contract for the second plant were formed in 1966, prior to the Florida Code's effective date, the Code is inapplicable to both contracts.

The District Court subsequently granted Westinghouse's motion for permission to seek an interlocutory appeal pursuant to 28 U.S.C. § 1292(b), and in November, 1977, this Court granted Westinghouse's petition for permission to appeal.

prices, with options on further replacement regions; (b) to purchase the fuel on a long-term basis with a firm lump-sum price on the first core and a guaranteed buy-back of the irradiated fuel by Westinghouse; or (c) to purchase the fuel on a long-term mills-per-kwh basis."

3. The Plant Equipment Contract provides in relevant part:
"Florida [FPL] shall have the option, until July 1, 1967, to firm up its purchase from Westinghouse of a duplicate . . . nuclear supply system and moisture separator-reheater for the second nuclear power plant at its Turkey Point site . . . In the event Florida does not exercise such option, Florida is under no obligation to Westinghouse with respect to the second unit."
Similarly, the preamble to the Fuel Contract states, in relevant part:
"Florida [FPL] proposes to construct and operate two large nuclear power plants at its Turkey Point site. This Contract evidences Florida's willingness to purchase and the willingness of Westinghouse to sell fuel for the first plant *and the willingness of Westinghouse to provide an option for Florida to purchase fuel for the second plant* (emphasis supplied)."
More specifically, § 16 of the Fuel Contract provides that
"Florida shall have the *option* until July 1, 1967 to firm up a fuel service by Westinghouse for the second plant on the basis of the provisions contained in this Contract, or on terms at least as favorable to Florida." (Emphasis supplied)

4. Along with several similar suits instituted by other Westinghouse customers, this case was transferred for pre-trial purposes to the United States District Court for the Eastern District of Virginia pursuant to 28 U.S.C. § 1407. Thereafter, this and nine similar cases were transferred to that same court pursuant to 28 U.S.C. § 1404(a) for trial without a jury.

The narrow question presented upon appeal is whether the District Court erred in holding the Florida U.C.C. inapplicable to the two fuel contracts involved in this action. We find the U.C.C. applicable to the second fuel contract and reverse the District Court on that point. With regard to the first fuel contract, we affirm the holding below that the U.C.C. is inapplicable.

The District Court erred in holding that "the common law of excuse in Florida," rather than the U.C.C., governs the fuel contract for the second plant. The Florida U.C.C., enacted in June, 1965, provides that "[t]his code shall become effective at 12:01 a. m. on January 1, 1967. It applies to transactions entered into and events occurring *after* that date." U.C.C. § 10–101 [Fla. Stat. § 680.101(1)]. The 1966 fuel contract, while establishing a contractual obligation on the part of the respective parties to sell and to purchase fuel for the first power plant, merely granted to FPL an option, exercisable until July, 1967, to purchase fuel for a second plant. This option was not exercised by FPL until February, 1967, after the Florida Code's effective date. Nevertheless, the District Court, stressing that the *option* "was binding upon Westinghouse as of the date of the 1966 contract," concluded that the Code did not apply to the fuel contract for the second plant because "the Code should not apply retroactively to contracts entered into before the effective date of the Code.". What the Court failed to realize is that an option contract potentially involves *two* contracts:

> "The option agreement is a contract distinct from the contract to which the option relates, since it does not bind the optionee to perform or to enter into the contract under the terms specified in the option. In this sense, a binding option is a contract; and it is also an offer which, when accepted, will create another contract." 17 C.J.S. *Contracts* § 1(1)(f).

Accord, 1 *Williston on Contracts,* § 61A, at 198–99 (3rd ed. 1957). This basic hornbook law is recognized by Florida courts. *South Investment Corp. v. Norton* (Fla.1952) 57 So.2d 1, 2; *Frissell v. Nichols* (1927), 94 Fla. 403, 114 So. 431, 433; *Goodman v. Goodman* (Fla.1st Dist.1973) 290 So.2d 552, 555.

In the instant case, the option contract, entered into prior to the Code's effective date, was indeed governed by pre-Code law. However, once that option was exercised, the option contract ceased to exist; out of it arose the contract to supply fuel for the second FPL power plant. As this latter contract did not come into existence until after the effective date of the U.C.C., it is governed by the Code. *See Shavers v. Duvall County* (Fla.1954) 73 So.2d 684, 689.

The District Court also held that the U.C.C. is inapplicable to the fuel service contract for the first plant, reasoning that since the contract itself was executed prior to the effective date of the Florida Code, Florida pre-Code law should control any contractual disputes. Westinghouse, on the other hand, relying upon the effective date provision of the Florida Code [§ 680.101(1)] [U.C.C. § 10–101] argues that the Code is applicable not merely to "transactions entered into" after the Code's effective date, but also to "events occurring after" the effective date. Thus, reasons Westinghouse, the Code applies even to transactions entered into prior to its effective date where "events" relevant to a contractual dispute arise thereafter. Here, Westinghouse alleges the occurrence of several such subsequent "events," among them the election by FPL of its fuel service option in 1972 (determining under which of three alternative arrangements fuel service would be provided by Westinghouse to FPL) and the alleged failure of presupposed conditions in 1974–75 (*i. e.,* failure of the uranium market to remain stable in price or quantities available).

In construing "events" as that term is used in § 680.101(1), one must also look to the accompanying subsection [680.101(2)] [U.C.C. § 10–102(2)], which states:

> "Transactions validly entered into before the effective date specified in this section and the rights, duties and interests flowing from them remain valid thereafter and may be terminated, completed, consummated or enforced as re-

quired or permitted by any statute or other law amended or repealed by this code as though such repeal or amendment had not occurred."

The problem is to reconcile the term "event" in U.C.C. § 10–101 with the transitional language of U.C.C. § 10–102(2). There is scarce legislative history to aid in the resolution of this conflict,[5] and the Florida courts have not yet directly addressed the matter.[5a] We turn, therefore, to the decisional law outside of Florida.

Many courts have relied upon the language of U.C.C. § 10–102(2) to hold the Code inapplicable to post-Code disputes involving pre-Code transactions. In *Empire Life Insurance Co. of America v. Valdak Corporation* (5th Cir. 1972) 468 F.2d 330, the question was whether the U.C.C. applied to a post-Code foreclosure sale arising out of a security agreement entered into prior to the Code's effective date. The Court, after citing U.C.C. § 10–102(2), stated:

"*In the overwhelming majority of cases where retroactivity of the Code has been in issue, it has been found that when a transaction was entered into prior to the effective date of the Code, the transaction would thereafter be governed for all purposes by the law in effect when the transaction was entered into. E. g., In re Kokomo Times Publishing and Printing Corp.,* D.Ind.1968, 301 F.Supp. 529; *Phoenix v. Kovacevich,* 246 Cal.App.2d 774, 55 Cal.Rptr. 135 (1966); *Leiter v. Arnold,* 114 Ga.App. 323, 151 S.E.2d 175 (1966); *Wellbro Building Co. v. McConnico,* 421 P.2d 837 (Okl.1966); *McCormack v. E. E. McCormack Co.,* 239 Or. 264, 397 P.2d 198 (1964); and *Lack's Stores, Inc. v. Waisath* [464 S.W.2d 220 (Tex.Civ.App.1971), rev'd on other grounds, 474 S.W.2d 444 (Tex.

Sup.Ct.)]. *Contra, United Sec. Corp. v. Bruton,* 213 A.2d 892 (D.C.App.1965). The conclusion is therefore inescapable that this security agreement, entered into ten months before the effective date of the Code in both Texas and North Dakota, is governed by the prior law, even as to those aspects of the transaction, including the foreclosure, that took place after the effective date of the Code." 468 F.2d at 333 (footnote omitted) (emphasis supplied).

*In the Matter of Kokomo Times Publishing and Printing Corp.* (S.D.Ind.1968) 301 F.Supp. 529 produced a similar result. There a conditional sales contract entered into 15 days prior to the effective date of the Indiana U.C.C. was held to be governed by pre-Code law even though installation of the goods under the seller's supervision was not completed until after the effective date. Citing U.C.C. § 10–102(2), the Court said:

"Literally applied, this statute means that under conditional sales contracts executed prior to [the effective date], filing provisions requirements and priorities provisions of the law prior to [the effective date] applied. Interpretation of similar provisions of the Commercial Code in other states consistently has been the same, i. e., agreements entered into prior to the effective date of the code are regulated by pre-Code law as to filing priorities, remedies and the like under the agreement." 301 F.Supp. at 535 (citations omitted).

Still another similar result was reached in *Rinnert v. Indianapolis Morris Plan Corp.* (1966) 74 Ill.App.2d 388, 220 N.E.2d 256. There the plaintiffs attacked a post-Code

---

**5.** The 1962 Report on the Uniform Commercial Code by the Committee on Uniform State Laws of the Association of the Bar of the City of New York suggests that the term "events" was not inserted in § 10–101 for the purpose of granting additional substantive rights or defenses under the U.C.C. to parties to a pre-Code transaction.

**5a.** Although not directly on point, *Lewis v. Associated Medical Institutions* (Fla.App.3d Dist. 1977) 345 So.2d 852, can, but need not, be read

to support the Westinghouse position that the U.C.C. is applicable in the instant situation. On the other hand, *IPEC, Inc. v. International Printing Machinery Co.* (Fla.App.3d Dist.1971) 251 So.2d 911 suggests that the savings clause in U.C.C. § 10–102(2) requires the application of pre-Code law to pre-Code transactions. Thus, we are presented with two Florida cases, neither of which is directly on point, and each of which can be read as leading to a different result in the present case.

sale of property under a pre-Code chattel mortgage on the ground that the sale failed to comply with an Illinois statute in effect at the time the mortgage was executed but expressly repealed by the U.C.C. The Court applied the repealed statute, holding that the Code's transitional provision [§ 10–102(2)] makes former law applicable to transactions entered into prior to the Code's effective date. Said the Court:

"The plain meaning of the savings provision is that rights, duties, and interests flowing from a transaction, whether statutory or not, may be terminated, completed, or consummated under the provisions of the old statutes when the transaction was entered into prior to [the Code's effective date]. This is the same interpretation which other jurisdictions have given to the identical provisions." 220 N.E.2d at 258 (citations omitted).

Westinghouse, in an attempt to overcome the majority view, cites several cases which, it claims, support the application of the U.C.C. to the dispute involving the first fuel contract. One of these decisions is from this Circuit. *Deering Milliken Research Corp. v. Textured Fibres, Inc.* (4th Cir. 1969) 415 F.2d 875. The Court there held that South Carolina's long-arm statute (enacted as part of the South Carolina U.C.C.) confers jurisdiction over a person who breaches a contract after the Code's effective date even though the contract on which jurisdiction is based is executed before that date. The Court, after citing the Code's effective date provision, stated:

"The provisions governing the effective date are not limited to transactions entered into after [the effective date]. They also embrace 'events occurring after that date.' Literally, the breach of a contract and the simultaneous accrual of a cause of action are events. And, since a literal construction of 'events' is consistent with the intention of the South Carolina legislature to expand that state's jurisdiction, we are not at liberty to deny effect to this part of the statute." 415 F.2d at 877.

Thus, held the Court, the defendant's post-Code underpayments, being significant breaches of a licensing agreement, were "events sufficient to bring the long-arm statute into effect." *Id.*

There is an essential distinction between *Deering Milliken* and the present case. The Court there emphasized that it was responding to the intention of the South Carolina legislature to expand the State's jurisdiction, as distinguished from a legislative intent to alter substantive contractual rights, which is what Westinghouse, by its plea based on the U.C.C., seeks to do here. *Deering Milliken* is one of several cases in which courts have applied to pre-Code transactions *procedural* changes resulting from enactment of the U.C.C. In *Ohio Brass Co. v. Allied Products Corp.* (N.D. Ohio 1972) 339 F.Supp. 417, a U.C.C. statute of limitations was applied to a pre-U.C.C. contract. Although the Court felt that the intent of the transitional provision "was that adoption of the Uniform Commercial Code should not disturb duties fixed by or rights vested under contract entered prior thereto," it took a different view of the procedural issue in the case:

"The Ohio Supreme Court in *Smith v. N.Y.C. Rd. Co.*, 122 Ohio St. 45, 170 N.E. 637 (1930) specifically adopted the language of the United States Supreme Court ruling in *Terry v. Anderson*, 95 U.S. 628, 25 L.Ed. 365 (1877), that:

'The parties to a contract have no more a vested interest in a particular limitation which has been fixed, than they have in an unrestricted right to sue. They have no more a vested interest in the time for the commencement of an action than they have in the form of the action to be commenced; and as to the forms of action or modes of remedy, it is well settled that the legislature may change them at its discretion, provided adequate means of enforcing the right remain.' 122 Ohio St. 49, 50, 170 N.E. 639.

"Applying that rule to the fact situation, it was within the discretion of the Ohio legislature to reduce the limitation period for the bringing of an action for breach

of warranty on a contract executed prior to July 1, 1962 as to which the breach occurred after July 1, 1962 from fifteen to four years." 339 F.Supp. at 419–20. Similarly, another Court upheld the application of the U.C.C.'s burden of proof standard in a trial involving a pre-Code transaction. *United Securities Corporation v. Bruton* (D.C.Ct.App.1965) 213 A.2d 892. In so doing, the Court stressed that the matter involved was not substantive but procedural:

"Although the entire transaction occurred prior to the effective date of the Uniform Commercial Code, the trial occurred after the effective date, and the burden of proof, a procedural matter, was controlled by the law existing at date of trial. There is no vested right in a rule of evidence, and a statute relating solely to procedural law, such as burden of proof and rules of evidence, applies to all proceedings after its effective date even though the transaction occurred prior to its enactment. Procedural statutes are the exception to the general rule against retroactive application, if indeed the application can be considered retroactive. *The savings clause of the Act under consideration preserves the 'rights, duties and interests' of the parties to transactions entered into prior to its effective date, but we do not construe this as an intention by Congress that procedural changes made by a statute should not apply in court proceedings for the enforcement of such rights, duties and interests.*" 213 A.2d at 893–894 (footnotes omitted) (emphasis supplied).[6]

*Deering Milliken* clearly falls within the *Ohio Brass* and *United Securities* category of procedural decisions. The utilization of the long-arm provision in that case did not affect the substantive contractual rights involved. *See McGee v. International Life Insurance Co.* (1957) 355 U.S. 220, 224, 78 S.Ct. 199, 2 L.Ed.2d 223. And the *Deering Milliken* Court was careful to hold only that the contractual breaches were "events sufficient to bring the long-arm statute into effect;" thus, the Court limited its construction of the term "events" to the procedural issue at hand.

Westinghouse also cites *Humble Oil & Refining Co. v. Copley* (1972) 213 Va. 449, 192 S.E.2d 735 as supporting its position that the U.C.C. should apply to the first fuel contract in the present case. In *Copley* the Virginia Supreme Court allowed the plaintiff the option provided under the U.C.C. of suing on a note, made pre-Code by the defendant, rather than on the underlying obligation. There, however, no obligation under the note arose until the defendant received and sold certain goods consigned to him by the plaintiff. Because the consignments and sales in question did not occur until after the Code's effective date, the defendant's obligation under the note was not created until the U.C.C. was already in effect. Thus, the *Copley* Court correctly held that the U.C.C. was applicable to a suit involving an obligation which did not arise until after the occurrence of certain post-Code transactions.

Next, we reject Westinghouse's contention that a post-Code contractual default is an "event" within the meaning of the Code's effective date provision so as to bring a pre-Code contract within the substantive provisions of the U.C.C. Were this the case, every pre-Code contract would be subject to a change in the applicable law if there occurred a post-Code breach of that contract. Neither the decisional law nor commercial common sense suggests such an approach, and we agree with the Court below that such a result could not have been intended by the Florida legislature in adopting the U.C.C.

Similarly, we reject Westinghouse's contention that certain acts done pursuant to the contract should be construed as "events" bringing the contract within the purview of the U.C.C. In this regard we agree with the District Court's reliance upon *In re Armor Industries, Inc.* (S.D. Mich.1968) 5 U.S.C.Rep.Serv. 1049 where it was stated:

---

6. The savings clause referred to by the Court is U.C.C. § 10-102(2).

"While the word 'event' is not defined in the code it is inconceivable that any duty imposed by pre-code law which may have to be performed after the effective date of the code is an event contemplated by MSA § 19.991. [U.C.C. § 10–101] If it were, then every pre-code transaction which had not been 'terminated, completed, consummated or enforced' prior to the effective date of the code would be governed by the code. The language of the code does not suggest such a result nor is there any basis for holding that the draftsmen of the code or the Michigan legislature intended it." 5 U.C.C.Rep. Serv. at 1052 (footnote omitted).

Therefore, the 1972 election by FPL of its fuel service option under the first fuel contract, as an action taken pursuant to the terms of that contract, is not an "event" within the meaning of U.C.C. § 10–101.

Finally, we address Westinghouse's contention that the alleged failure of presupposed conditions (concerning the instability of the uranium market) is an "event" under U.C.C. § 10–101. The Code's transitional provision [§ 10–102(2)] says, in effect, that valid pre-Code transactions and the rights and duties thereunder may be enforced under pre-Code law as though such law had not been altered by the Code. Here, the law of excuse became intertwined with the rights and duties of the parties to this action when the first fuel contract was executed, and FPL is entitled to enforce that contract under the pre-Code law of excuse as though U.C.C. § 2–615 had never been enacted. To put it another way, Westinghouse is not entitled to rely on § 2–615 as an excuse from performing its contractual duties because those duties are determined entirely under pre-Code law. Obviously, therefore, the alleged failure of presupposed conditions cannot be considered an "event" under U.C.C. § 10–101.

We note in closing the Westinghouse contention that, in any event, the law of excuse is the same under the U.C.C. as it is under pre-Code case law. The Florida Comments to U.C.C. § 2–615 indicate this to be the case. However, inasmuch as we granted this interlocutory appeal solely to determine whether or not the U.C.C. is applicable, we need not and do not address this issue.

To summarize: We hold that U.C.C. § 2–615 applies to the second fuel contract and therefore reverse the judgment below on that point. As to the first fuel contract the U.C.C. is inapplicable and we affirm the judgment below.

*AFFIRMED IN PART and REVERSED IN PART.*