Charles B. Swartwood, J.
This is a motion for summary judgment in an action for declaratory judgment whereby the plaintiff seeks, first, a determination that the contract wherein the plaintiff agreed to supply milk to the defendant school district at an agreed price be terminated without further liability on the grounds of legal “ impossibility ” or “ impracticably ” because of the occurrence of events not contemplated by the parties which makes performance impracticable and, second, a determination that the defendant school district has authority to unilaterally relieve the plaintiff of its contract without violating section 1 of article VIII of the New York State Constitution.
We commend counsel on the quality of their briefs.
The background of this dispute is that the price of raw milk at the farm site is and has been controlled for many years in this area by the United States Department of Agriculture through the New York-New Jersey Market Administrator. The president of the plaintiff milk dealer has for at least 10 years bid on contracts to supply milk for the defendant school district and is thoroughly conversant with prices and costs. Though the plaintiff avers that the defendant was aware of the prices of raw milk and the profit picture, the fiscal officer of the defendant denies that either the price of raw milk or the profit structure of suppliers was known or of any concern to him or the defendant. The defendant’s only concern was the assurance of a steady supply of milk for the school lunch program at an agreed price on which the school’s budget had to be based.
The mandated price of raw milk has in the past fluctuated from a cost of $6.73 cwt. in 1969 to a high of $7.58 cwt. in 1972, or 12%, with fluctuation within a calendar year ranging from 1% to 4.5%. The plaintiff agreed to supply milk to the defendant for the school year 1973-1974 by agreement of June 15, 1973 at a price of $.0759 per half pint, at which time the mandated price of raw milk was $8.03 cwt. By November of 1973 the price of raw milk had risen to $9.31 cwt. and by December 1973 to $9.89 cwt., an increase of 23% over the June, 1973 price. However, it should be noted that there was an increase from the low price in 1972 to the June 1973 price (date of the con *1082 tract) of 9.5%. Because of considerable increase in the price of raw milk, the plaintiff, beginning in October 1973, has requested the defendant to relieve the plaintiff of its contract and to put the contract out for rebidding. The defendant has refused.
The plaintiff spells out in detail its costs based on the June - and December prices of raw milk and shows that it will sustain a loss of $7,350.55 if it is required to continue its performance on the same volume with raw milk at the December price. Its contracts with other school districts where it is faced with the same problem will triple its total contemplated loss.
The plaintiff further claims that because of the advent of the Federally sponsored milk lunch subsidy of $.04 to the defendant, the price per half pint of milk will be dropped to $.05 and the volume of milk sold will increase, thus further increasing the plaintiff’s loss. There is no substantiation for this estimated volume increase so that we do not meet that question.
The plaintiff goes to great lengths to spell out the cause of the substantial increase in the price of raw milk, which the plaintiff argues could not have been foreseen by the parties because it came about in large measure from the agreement of the United States to sell huge amounts of grain to Russia and to a lesser extent to unanticipated crop failures.
The legal basis of the plaintiff’s request for being relieved of the obligation under the contract award is the doctrine known variously as ‘ ‘ impossibility of performance ’ ’ and ‘ ‘ frustration of performance ” at common law and as “ excuse by failure of presupposed conditions ” under section 2-615 of the Uniform Commercial Code.
The common-law rule is stated in Restatement of Law, Contracts (vol. 2, § 454) as follows: “ § 454. Definition of impossibility. In the Restatement of this Subject impossibility means not only strict impossibility but impracticability because of extreme and unreasonable difficulty, expense, injury or loss involved. ’ ’
Performance has been excused at common law where performance has become illegal (Boer v. Garcia, 240 N. Y. 9; Matter of Kramer & Uchitelle, 288 N. Y. 467; Labaree Co. v. Crossman, 100 App. Div. 499, affd. without opn. 184 N. Y. 586); where disaster wipes out the means of production (Goddard v. Ishikawajima-Harima Heavy Inds. Co., 29 A D 2d 754, affd. without opn. 24 N Y 2d 842); where governmental action prevents performance (Nitro Powder Co. v. Agency of Canadian Car & Foundry Co., 233 N. Y. 294; Mawhinney v. Millbrook Woolen Mills, 231 N. Y. 290).
*1083 In Mineral Park Land Co. v. Howard (172 Cal. 289) the defendants agreed to take all the gravel from the plaintiff’s land up to a certain quantity. The defendants took only half the agreed amount because the balance of the gravel was under the water level. The court relieved the defendants from the obligation to pay for the balance under water because it was not within the contemplation of the parties that the gravel under the water level would be taken and secondly because thé cost of doing so would be 10 to 12 times as expensive. The court stated the common-law rule (p. 293): “ ‘ A thing is impossible in legal contemplation when it is not practicable; and a thing is impracticable when it can only be done at an excessive and unreasonable cost.’ (1 Beach on Contracts, sec. 216.) We do not mean to intimate that the defendants could excuse themselves by showing the existence of conditions which would make the performance of their obligation more expensive than they had anticipated, or which would entail a loss upon them. But, where the difference in cost is so great as here, and has the effect, as found, of making performance impracticable, the situation is not different from that of a total absence of earth and gravel. ’ ’
407 E. 61st Garage v. Savoy Corp. (23 N Y 2d 275) holds that where economic hardship alone is involved performance will not be excused. This is so even where governmental acts make performance more expensive. (Baker v. Johnson, 42 N. Y. 126; U. S. v. Wegematic Corp., 360 F. 2d 674.) Existing circumstances and forseeability also play a part in determining whether a party should be relieved of his contracts. (407 E. 61stGarage v. Savoy Corp., supra; Farlou Bealty Corp. v. Woodsam Assoc., 49 N. Y. S. 2d 367, affd. without opn. 268 App. Div. 975, affd. without opn. 294 N. Y. 846.)
Section 2-615 of the Uniform Commercial Code states in part: “ Except so far as a seller may have assumed a greater obligation and subject to the preceding section on substituted performance:
“ (a) Delay in delivery or non-delivery in whole or in part by a seller * * * is not a breach of his duty under a contract for sale if performance as agreed has been made impracticable by the occurrence of a contingency the non-occurrence of which was a basic assumption on which the contract was made or by compliance in good faith with any applicable foreign or domestic governmental regulation or order whether or not it later proves to be invalid.”
The Official Comment, Mo. 3 to that section points out that the test of impracticability is to be judged by commercial *1084 standards. Official Comment No. 4 states: “ Increased cost alone does not excuse performance unless the rise in cost is due to some unforeseen contingency which alters the essential nature of the performance. Neither is a rise or a collapse in the market in itself a justification, for that is exactly the type of business risk which business contracts made at fixed prices are intended to cover. But a severe shortage of raw materials or of supplies due to a contingency such as war, embargo, local crop failure, unforeseen shutdown of major sources of supply or the like, which either causes a marked increase in cost or altogether prevents the seller from securing supplies necessary to his performance, is within the contemplation of this section. (See Ford & Sons, Ltd., v. Henry Leetham & Sons, Ltd., 21 Com. Oas. 55 (1915, K.B.D.).) ”
Official Comment No. 10 states in part that “ governmental interference cannot excuse unless it truly 1 supervenes ’ in such a manner as to be beyond the seller’s assumption of risk.”
We find little authority dealing with this section based on facts that are similar to those in this case. (See, however, Transatlantic Financing Corp. v. United States, 363 F. 2d 312; United States v. Wegematic Corp., 360 F. 2d 674, and Natus Corp. v. United States, 371 F. 2d 450.)
The Transatlantic case is somewhat analogous to the question raised here. In that case the Suez Canal was closed causing the plaintiff’s ship en route to Iran to have to go around Africa to deliver its cargo of wheat. The plaintiff sought to recover the increased expense from the defendant. The court found that shipping dangers in the Suez Canal area could have been anticipated; that the risk should be allocated to the plaintiff and that the increased cost was not of such magnitude to say that it was not within the accepted degree of risk. The doctrine enunciated by section 2-615 of the Uniform Commercial Code was explained by the court (p. 315): “ The doctrine ultimately represents the ever-shifting line, drawn by courts hopefully responsive to commercial practices and mores, at which the community’s interest in having contracts enforced according to their terms is outweighed by the commercial senselessness of requiring performance. When the issue is raised, the court is asked to construct a condition of performance based on the changed circumstances, a process which involves at least three reasonably definable steps. First, a contingency — something unexpected — must have occurred. Second, the risk of the unexpected occurrence must not have been allocated either by agreement or by custom. Finally, occurrence of the contingency must have rendered performance commercially impracticable.”
*1085 Applying these rules to the facts here, we find that the contingency causing the increase of the price of raw milk was not totally unexpected. The price from the low point in the year 1972 to the price on the date of the award of the contract in June, 1973 had risen nearly 10% and any business man should have been aware of the general inflation in this country during the previous years and of the chance of crop failures.
However, should we grant that the first test had been met and thus the substantial increase in price was due to the sale of wheat to Russia, poor crops and general market conditions which were unexpected contingencies, then the question of alio-" cation of risk must be met. Here the very purpose of the contract was to guard against fluctuation of price of half pints of milk as a basis for the school budget. Surely had the price of raw milk fallen substantially, the defendant could not be excused from performance. We can reasonably assume that the plaintiff had to be aware of escalating inflation. It is chargeable with knowledge of the substantial increase of the price of raw milk from the previous year’s low. It had knowledge that for many years the Department of Agriculture had established the price of raw milk and that that price varied. It nevertheless entered into this agreement with that knowledge. It did not provide in the contract any exculpatory clause to excuse it from performance in the event of a substantial rise in the price of raw milk. On these facts the risk of a substantial or abnormal increase in the price of raw milk can be allocated to the plaintiff.
As pointed out in the Transatlantic case (p. 319), where the circumstances reveal a willingness on the part of the seller to accept abnormal rises in costs, the question of impracticability of performance should be judged by stricter terms than where the contingency is totally unforeseen. The increase in the price of raw milk from June to December, 1973 was 23% and the estimated loss to the plaintiff in completing the contract on the same assumed volume and estimated cost of raw milk would be $7,350.55.
Based on the plaintiff’s December, 1973 figures, including increased transportation cost, the cost of a delivered half pint of milk would be 10.4% greater than the bid price. The percentage would be 8.7% without the increased transportation cost.
There is no precise point, though such could conceivably be reached, at which an increase in price of raw goods above the norm would be so disproportionate to the risk assumed as to amount to “ impracticably ” in a commercial sense. However, we cannot say on these acts that the increase here has reached *1086 the point of “ impracticality ” in performance of this contract in light of the risks that we find were assumed by the plaintiff.
The plaintiff also seeks a declaratory judgment that the defendant could agree to cancel the contract without violating section 1 of article VIII of the New York State Constitution. (See New York Tel. Co. v. Board of Educ. of City of Elmira, 270 N. Y. 111.) Since the defendant has not indicated any willingness to excuse the plaintiff from performance, there is therefore no issue in that regard before us since we have held that the plaintiff is not entitled to be excused from performance under the law.
We do not pass on any question of the impact of an unexpected increase in volume, if that proves to be true, through the impact of the United States school lunch program.
The plaintiff’s motion is denied and the defendant is granted summary judgment dismissing the complaint.