**BERNINA DISTRIBUTORS, INC.,**
**Plaintiff-Appellee,**

**v.**

**BERNINA SEWING MACHINE CO.,**
**INC., Defendant-Appellant.**

**No. 78–1934.**

United States Court of Appeals,
Tenth Circuit.

April 6, 1981.

Rehearing Denied June 24, 1981.

Stephen G. Crockett, Salt Lake City, Utah (Robert G. Holt, Salt Lake City, Utah, with him on the brief), of Martineau, Rooker, Larsen & Kimball, Salt Lake City, Utah, for defendant-appellant.

Allen I. Neiman, Beverly Hills, Cal. (Patricia M. Wolfe, Beverly Hills, Cal., with him on the brief), of Neiman & Billet, Beverly Hills, Cal., for plaintiff-appellee.

Before McKAY, PECK * and LOGAN, Circuit Judges.

LOGAN, Circuit Judge.

This diversity case involves interpretation of a contract between an importer and a distributor of sewing machines. By the contract Utah law controls on all matters of interpretation, application, and enforcement.

Defendant Bernina Sewing Machine Co., Inc. (Importer), a Utah corporation, imports and supplies Bernina sewing machines to plaintiff Bernina Distributors, Inc. (Distributor), a California corporation, under the contract at issue in this case. The problems that have arisen relate mostly to pricing and are caused by the fluctuations of exchange rates and decreases in the value of U.S. dollars versus Swiss francs. The district court resolved all issues in favor of Distributor. Importer contends that the district court's interpretations of the contract's pricing provisions are contrary to the

* The Honorable John W. Peck, of the United States Court of Appeals for the Sixth Circuit, sitting by designation.

contract's plain meaning, that the court made erroneous decisions on admission of evidence, and its findings are not supported by substantial evidence. It also argues that if the trial court's interpretation is correct, Importer's performance is excused because the contract is impracticable or unconscionable. The contentions as they relate to each allegedly erroneous ruling will be considered separately hereafter.

Importer acquires Bernina sewing machines for sale throughout the western United States. Distributor, the exclusive distributor of the sewing machines in California, has purchased its machines from Importer since 1962. Importer pays in Swiss francs to purchase the machines, manufactured in Switzerland by Fritz Gegauf, Ltd. (Factory or the manufacturer). The 1962 contract between Importer and Distributor provided that various models could be purchased at specified prices (in dollars) but also provided that "[p]rices [are] automatically subject to change when factory costs are increased." (Ex. 131.) In 1964 a new contract with more specific attention to price increases was executed, stating that "prices . . . will be increased over the original contract prices in the exact amount of the factory raise, duty and freight additions." (Ex. 4.)

In 1971, the contract at issue in this case was executed, replacing the prior agreement. It was to run for seven years and longer under certain circumstances. Before entering this agreement, Distributor had brought lawsuits against both Importer and the manufacturer, the primary objective of which was to force the manufacturer to sell its machines directly to Distributor. The manufacturer threatened to cease business with Importer unless Importer could convince Distributor to dismiss its suits. Against this background the 1971 contract was agreed to, and Distributor's suits were dropped.

The 1971 contract price terms are the most comprehensive of the three contracts. Three categories of machines are listed in paragraph 8 of the contract: existing models, replacement models, and new models.[1] For existing models, specific dollar prices are listed (with the exception of two models, for which prices are to be calculated on the identical profit ratios of two models with prices already fixed). For replacement models, the price is "[t]he cost to the Distributor of the prior existing models plus any increase in price of the new model over the prior existing model imposed by the Factory, plus 10% of said increase." New models, which do not replace or correspond with existing models, are priced at the "same profit percentage that Model 730 with knee lift is now calculated at [found by the court to be 13.7%]."

Paragraph 9 of the contract reads as follows:

1. Paragraph 8, in full, provides as follows:
 "8. The Importer agrees to sell to the Distributor as ordered, the following makes and models of Bernina sewing machines at the following unit prices:

| (a) Existing Models | Prices |
| --- | --- |
| 730 with knee lift | $147.30 |
| 731 | 136.00 |
| 732 | 129.10 |
| 740 | 138.15 |
| 740–11 | Same profit ratio as Model 740 |
| 741 | 130.50 |
| 742 | 128.55 |
| 707 | 114.35 |
| 708 | 110.15 |
| 709 | 98.75 |
| 717 | 98.25 |
| 718 | 94.55 |

| (a) Existing Models | Prices |
| --- | --- |
| 719 | $ 90.55 |
| 317–25 | 145.35 |
| 316–10 | 144.35 |
| 217 | Same profit ratio as Model 217–15 |
| 217–15 | 175.15 |
| 217–20 | 202.00 |

(b) New models not yet manufactured which correspond with and replace existing models: At the cost to the Distributor of the prior existing models plus any increase in price of the new model over the prior existing model imposed by the Factory, plus 10% of said increase.

(c) New Models that are not yet manufactured and do not replace or correspond with existing models shall be calculated at the

"The foregoing prices of Bernina sewing machines shall be subject to increase or decrease as follows:

(a) To the extent of any increase or decrease of Factory's invoice costs of Bernina sewing machines to Importer.

(b) To the extent of any increase or decrease in duty charges.

(c) In the event charges or insurance, freight, handling, broker, port fees or other similar charges are increased 20% over present charges, the prices of Bernina sewing machines sold to Distributor shall likewise be increased to the extent of the entire increase over present charges. Increases or decreases in duty charges and in Factory sewing machine costs to Importer shall be adjusted as they occur. Increases in all other charges mentioned above shall be adjusted at the commencement of each calendar year."

(Ex. 1.)

For a short time the parties engaged in business without dispute. Changes in the exchange rate between dollars and Swiss francs were treated as increases in invoice costs to Importer, under paragraph 9(a) of the agreement, which were passed on in the exact amounts of the increases to Distributor. (Ex. 13.) But with the precipitous decline of the dollar in relation to the Swiss franc, Importer began in July 1973 to surcharge Distributor 10% above the increased cost of purchasing Swiss francs so it "could retain sufficient profit margin to justify continued sales." (Appellant's Brief, p. 11; see Ex. 16.) In addition, Importer imposed a 10% markup on all factory invoice increases on existing models (after May 1972), and concerning replacement models, Importer construed paragraph 8(b) of the agreement as entitling it to impose a 10% markup on each subsequent factory invoice increase. Distributor claimed Importer was entitled to only one 10% adjustment, occurring at the time of the introduction of the replace-

ment model. Concerning new models, Importer calculated its profit on the percentage of profit that Model 730 would yield at the then current rate of exchange, instead of at the 1971 rate of exchange.[2]

The trial court determined that Importer could exact no profit on the additional costs incurred from the exchange rate fluctuations, invoice increases on existing models, or invoice increases on replacement or new models incurred subsequent to the model's introduction. Additionally, the court determined that the profit on new models was to be determined by multiplying the 1971 profit ratio of Model 730 (13.7%) times the cost of the model in Swiss francs, and converting this figure to dollars at the exchange rate existing at the time of the contract's execution.

In reviewing the decision of the trial court, this Court is bound to accept its findings of fact if supported by substantial evidence and not clearly erroneous. *Federal Security Ins. Co. v. Smith*, 259 F.2d 294, 295 (10th Cir. 1958).

## I

Importer argues that the trial court erred in prohibiting it from charging a margin of 10% on the increased cost incurred by exchange rate fluctuations. By the time of trial, the reduced value of the dollar in the purchase of Swiss francs had nearly doubled Importer's costs and thus halved its rate of return per dollar invested. While the exchange rate had fluctuated mildly prior to the execution of the contract, it had not previously indicated any continuous, substantial devaluation of the dollar in relation to the franc. (Ex. 112, 113.) The record indicates, however, that Importer was aware of a 7% devaluation of the dollar with respect to Swiss francs occurring just prior to the contract's execution. (Ex. 41, 42.)

---

same profit percentage that Model 730 with knee lift is now calculated at."
(Ex. 1.)

2. Other disputes over numbers of sewing machines Distributor was required to order and interest on warehoused machines are treated in parts IV and V hereafter.

Importer maintains that the risk of currency fluctuations had not been considered or allocated in the contract and that under Utah's enactment of the Uniform Commercial Code (U.C.C.), Utah Code Ann. § 70A–2–305(1) (1980), this "open price term" should be determined according to what the court finds to be reasonable. That section provides, in part, "The parties if they so intend can conclude a contract for sale even though the price is not settled. In such a case the price is a reasonable price at the time for delivery if (a) nothing is said as to price ...." We cannot agree that "nothing" was said as to pricing the sewing machines in question. The contract provisions here are quite comprehensive concerning base prices and modifications pursuant to cost increases in invoice, duty, shipping, insurance, and the like. Hence, the statutory provision is inapplicable to this case.

The trial court's conclusion that the contract did not allow a surcharge of 10% on currency fluctuations is not clearly erroneous. The pricing provisions in paragraph 8 of the contract set fixed base prices and leave to paragraph 9 all price fluctuations, with the exception of increases on replacement and new models discussed hereafter. Paragraph 9 limits all price increases incurred by reason of invoice, duty, insurance, freight, handling, broker, port fees, and "other similar charges" to the *extent* of the increases. Thus, we believe the contract places the risk of a diminishing profit margin on Importer in case of increasing costs and find the trial court's holding that the Importer bears the risk of currency fluctuations, once a price is established for a model, is amply supported by the record. Additionally, Importer's course of performance prior to July 1973, charging for the additional cost incurred by reason of the fluctuation but not attempting to charge a margin on the increase, supports the trial court's view that this surcharge was not contemplated by the contract.

■ Importer asserts that the court's interpretation makes the contract impracticable under Utah Code Ann. § 70A–2–615 (1980). That U.C.C. section excuses performance under the contract "[e]xcept so far as a seller may have assumed a greater obligation" when performance "has been made impracticable by the occurrence of a contingency the nonoccurrence of which was a basic assumption on which the contract was made ...." In our view the instant contract is not one made "impracticable" by the contingency of the devalued dollar. The contract, as interpreted by the trial court, always allows a gross profit margin, although the return on capital investment has been reduced considerably because of the devaluation of the dollar. Moreover, there is considerable evidence that Importer assumed this particular risk. The contract lumps all the shipping and invoice costs in one provision which allows price increases only to the extent of the cost increases to Importer. Importer's letter to Distributor concerning a 7% devaluation of the dollar in relation to the franc, sent three weeks prior to the contract execution, shows clear foreknowledge of the possibility of currency fluctuations (Ex. 41) and, thus, supports the finding that section 2–615 is inapplicable. Uniform Commercial Code 2–615, Comment 8 states:

"[T]he exemptions of this section do not apply when the contingency in question is sufficiently foreshadowed at the time of contracting to be included among the business risks which are fairly to be regarded as part of the dickered terms, either consciously or as a matter of reasonable, commercial interpretation from the circumstances."

See also *Iowa Elec. Light & Power Co. v. Atlas Corp.*, 467 F.Supp. 129 (N.D.Iowa 1978); *Eastern Air Lines, Inc. v. Gulf Oil Corp.*, 415 F.Supp. 429 (S.D.Fla.1975); *Robberson Steel, Inc. v. J. D. Abrams, Inc.*, 582 S.W.2d 558 (Tex.Civ.App.1979); *Maple Farms, Inc. v. City School District*, 76 Misc.2d 1080, 352 N.Y.S.2d 784 (Sup.Ct. 1974).

■ Finally, cost increases alone, though great in extent, do not render a contract impracticable. U.C.C. § 2–615, Comment 4; *Tony Downs Food Co. v. United States*, 530 F.2d 367 (Ct.Cl.1976); *Iowa Elec. Light &*

*Power Co. v. Atlas Co.*, 467 F.Supp. 129; *Publicker Industries, Inc. v. Union Carbide Corp.*, 17 U.C.C.Rep. 989 (E.D.Pa.1975). In *Gulf Oil Corp. v. F. P. C.*, 563 F.2d 588, 600 (3d Cir. 1977), the Third Circuit held that the doctrine of impracticability was not available unless the party seeking to excuse performance could show he could perform only at a loss, and that the loss would be especially severe and unreasonable. We hold the defense of impracticability is unavailable in the instant case.

■■■ Importer next contends that the contract is unconscionable under Utah Code Ann. § 70A–2–302 (1980) because Importer was unaware of the risk of an exchange rate fluctuation, ignorant of the term of the contract (as construed by the trial court), and lacked choice in the matter because of the pressure exerted by Factory to force a contract (to obtain a dismissal of the suits by Distributor). Uniform Commercial Code § 2–302, Comment 1 indicates that the principle of that provision is one of "prevention of oppression and unfair surprise . . . and not of disturbance of allocation of risks because of superior bargaining power." In order to avail oneself of the section, proof must show the contract is "so one-sided as to be unconscionable under the circumstances existing *at the time of the making* of the contract." *Id.* (emphasis added).

This Court has previously held that an increase in price has nothing to do with unconscionability. *Bradford v. Plains Cotton Cooperative Ass'n*, 539 F.2d 1249, 1255 (10th Cir. 1976). Lack of oppression is particularly clear in this case because Importer is guaranteed a gross profit. Exchange rate fluctuations before the date of the contract were relatively small, and a provision limiting price increases to cost was not so one-sided as to be oppressive at the time of the contract's making. In addition, Importer was aware of the possibility of a reduction in profits due to exchange rate fluctuations and could have guarded against this contingency. Indeed, Distributor several times suggested that a cost-plus formula be utilized, (Ex. 7) but Importer refused, insisting on a fixed profit scheme.

(Ex. 8.) Importer was represented by counsel throughout and should have known that the contract provided for price increases only to the extent of actual cost increases. We cannot agree that Importer was forced by the manufacturer to conclude whatever deal Distributor demanded; there is no significant imbalance in the financial strength of these parties. To grant relief on this issue would be to disturb an agreed-upon allocation of risk between commercial equals.

## II

■■■ Concerning the interpretation of paragraph 8(b), which provides for the pricing of replacement models, we agree with the trial court's holding that the contract provides for a profit increase only at the time of the introduction of the replacement model. Paragraph 8(b) provides that the price to Distributor will be the cost "of the prior existing models plus *any* increase in price of the new model over the prior existing model imposed by the Factory, plus 10% of *said* increase." (Ex. 1) (emphasis added). Importer argues for a plain meaning interpretation of the contract, asserting that the use of the term "any" means "each" and, thus, each increase in the manufacturer's price of the new model over the prior existing model results in a 10% surcharge. This subparagraph deals by its terms only with increases occurring pursuant to replacement of an old model by the new model, however, and not to price increases occurring after the model's introduction. Paragraph 9 provides, "The foregoing prices of Bernina sewing machines shall be subject to increase or decrease . . . (a) To the extent of any increase or decrease of Factory's invoice costs of Bernina sewing machines to Importer." The most rational construction of the two paragraphs in context together seems to be that paragraph 8 supplies the initial price to Distributor for existing, replacement, and new models, and paragraph 9 controls price increases of each of those models, allowing no additional profit by Importer for invoice increases. Acceptance of Importer's interpretation would force us to

ignore relevant parts of the contract, which we will not do. *See Thomas J. Peck & Sons, Inc. v. Lee Rock Products, Inc.*, 30 Utah 2d 187, 191, 515 P.2d 446, 448 (1973). Thus, the Distributor's interpretation must prevail if we confine consideration to the four corners of the instrument.

Importer asserts that the trial court improperly relied upon parol and extrinsic evidence on this issue, referring in its brief to the admittance into evidence of Exhibits 8 and 9 and the testimony of Mr. and Mrs. Ridderhoff, officers of Distributor, dealing with contract negotiations. Mr. Ridderhoff testified that the question of raises after the introduction of a replacement model were not discussed verbally and that he relied upon the wording of the contract. (Tr. 497–99.) This was in accord with the testimony of Mr. Jensen, president of Importer. (Tr. 257–59.) Mrs. Ridderhoff's testimony was that replacement models were discussed and there was to be a one time increase only. (Tr. 529–30.) Exhibit 9 was not made a part of the appellate record, and Exhibit 8, a letter sent during negotiations by Importer's counsel to the lawyer for Distributor, contains nothing specific. We find nothing to indicate, however, that the trial court relied on any of this evidence in making its finding of facts on this issue. Indeed, the court held that provisions in paragraph 8(a) demonstrated a "plain and clear" intent to set fixed prices and that paragraph 8(b) follows 8(a). (App. 4.) Moreover, as Distributor correctly points out, parol evidence concerning the intent of the contracting parties was properly admitted at trial pursuant to the trial court's pretrial order that Importer had raised the issue of reforming paragraph 8(b) of the contract. (App. 61.)

Finally, in regard to the interpretation of paragraph 8(b), Importer argues that the trial court improperly excluded as hearsay a letter offered by Importer to show the state of mind of the Importer's officers at the time it executed the contract. The letter, dated August 11, 1977, was written by an officer of the manufacturer to Importer, answering an inquiry by Importer. (Tr. 239.) It apparently purported to describe a conversation between the president of Importer and a representative of the Factory that occurred in 1971. (Appellant's Brief, p. 37.) We find no abuse of discretion in the denial of its admission into evidence.[3] We hold the trial court properly found Importer overcharged Distributor on replacement models.

### III

Importer also alleges that the trial court erred in interpreting the contract provision on new models to allow only a 13.7% profit calculated at the 1971 rate of exchange. The contract provides that new models are to be "calculated at the *same profit percentage* that Model 730 with knee lift *is now calculated at.*" (emphasis added). The trial court found that Model 730 yielded a 13.7% profit at the time of the contract's execution, and that is not disputed on appeal. The trial court determined that the proper calculation of profit was 13.7% of the cost of the new model in Swiss francs, converted to dollars at the 1971 rate of exchange. Importer contends that because the profit rate is determined by the 1971 exchange rate, the return on dollars invested is actually considerably less than 13.7% and, thus, the court's interpretation is clearly erroneous. On this issue we agree with Importer.

First, the trial court itself seems to have confused somewhat the difference between the effects of fluctuations in the exchange rate on the profit margin calculated at the time of introduction of a new model and

---

**3.** Even if admitted and considered, the letter does not come close to establishing that Importer thought it was free to increase prices on new and replacement models each time price changes occurred after introduction. As represented to us (the letter is not in the record) the letter states that, while Importer was negotiating with Distributor on the 1971 contract, Factory had "agreed to avoid any further price increases on the then existing current models and until the new domestic models would replace the older models." (Appellant's Brief, p. 37.)

increases after introduction. In response to counsel's inquiries at trial, the court indicated the 13.7% margin should be applied to the prices in dollars charged at introduction of a new model, but without any further increase for currency fluctuations thereafter. Yet the trial judge apparently concluded this margin formula required pegging the exchange rate for this calculation at the 1971 level.[4] The argument in favor of the trial court's result is something like the following: If a new model costs the same in Swiss francs as Model 730, but because of devaluation of the dollar costs twice as much in dollars, the Importer should not receive twice the dollar profit through application of the 13.7% rate to the dollar price; this fluctuation is not essentially different in logic from increases after introduction of the model, which, we have affirmed above, may only be passed on in their exact amounts without additional margin.

The answer, we believe, lies in the fact that this contract is between two American companies which negotiated using dollar terms, without specific reference to any exchange rate fluctuations. To be sure it was known the machines would come from Switzerland and exchange rates might fluctuate, as they had within narrow margins prior to the contract. But the contract contemplated that changes in duties, freight rates, and the like which affected the costs in U.S. dollars would be adjusted upward or down under paragraph 9 without increasing or decreasing the gross margins of the Importer. By agreement, or acquiescence, fluctuations in exchange rates making existing model sewing machines more or less expensive, were passed on without affecting margins of the Importer. We have agreed with the trial court that changes brought about by exchange rate fluctuations affecting the dollar costs on

4. "MR. COOK: I would like to inquire of one area of clarification on the new models spoken of in the pretrial order in terms of totally new models. The contract here talks in Paragraph 9C—excuse me, 8C, 'New models that are not yet manufactured and do not replace or correspond with existing models shall be calculated at the same profit percentage that model 730 with knee lift is now calculated at'.

THE COURT: Yes. What that means is when a new model comes into existence that the profit margin on that shall be at the percent profit margin that was present in the model 730 as now calculated and that means as of the time of the contract.

MR. NEIMAN: But we would then go back to the old 2426 rate and compute forward from there.

THE COURT: That's right.

MR. COOK: We are not clear. That way new models that come out, we are paying an exchange rate of 40. Are we basing that on an actual dollar cost or are we going to have some kind of computed dollar cost on that?

MR. NEIMAN: Your Honor, my understanding is that we take—let's say the profit percentage of the 730 was 13.7 percent which it was based upon. What you have now told us is at that rate of exchange we would then recompute the new model as if the rate of exchange were 2426 plus 13.7 percent profit margin and add all increases and rates of exchange and other factors beyond that.

THE COURT: Yes.

MR. COOK: And that would not—when that new model is introduced it gives us 13.7 percent. Is that the Court's ruling?

THE COURT: No.

MR. COOK: If we *do* it with this arithmetic we don't come up with the profit percentage in terms of dollars—

THE COURT: *Well, I don't see why that is true because this says the same profit percentage so, if you have a new machine that costs a thousand dollars and if the profit percentage on the 730 was 13 percent as I said—*

MR. COOK: It is 13.7 percent.

THE COURT: *You are entitled to add 13 percent on top of that because that's the profit percentage on the model 730 but then it stays at that rate and then any increase that comes to that machine after that is represented by that same margin.*

MR. COOK: So, is that 13.7 percent of the actual dollar cost of that model at the time it is ordered? You see that kicks up—

THE COURT: Well, when it was first introduced—

MR. NEIMAN: But we are talking in terms, are we not, of Swiss francs?

THE COURT: Swiss francs, right.

MR. NEIMAN: Because that's where the difference lies.

THE COURT: We compute 13.7 percent of Swiss francs based upon what they were and we are complying with 8C which says the rate of exchange then at the rate of profit that then existed."

(Tr. 1391–93) (emphasis added).

replacement and new models, after they were introduced, are governed by paragraph 9 and do not permit a change in the Importer's margins.

Nevertheless, prices of new models are governed by paragraph 8. If the dollar had become dearer, and bought more Swiss francs after 1971 than before, we do not believe the Distributor could argue for a reduction in the dollar profit margins for existing models under this agreement; just as we have held the Importer may not increase its margins because the dollar buys fewer Swiss francs now. If we hold that the 13.7% margin applied to a new model must relate back to exchange rates at the date of the agreement rather than to the dollar cost at date of introduction, logic would seem to require that same relation back for the 10% increases on replacement models under paragraph 8(b). We think this argument proves too much and erroneously presumes the contracting parties considered currency exchange fluctuations.

The normal and natural reading of this contract, in the context in which it was negotiated, is that the parties intended to fix the Importer's margins (in dollars) on existing models at the time of the contract. Margins (in dollars) on increases in costs of replacement models and on new models were to be established at the time of their introduction. All cost changes after introduction were not to affect the margins. The parties were thinking of costs in terms of U.S. dollars, and they were thinking of margins in terms of dollars and percentages of dollars, as would be true in most contracts between American companies which were not giving specific thought to foreign currencies. We find no direct evidence in the record that the parties intended to peg calculations of the Importer's gross margins to the 1971 exchange rate between Swiss francs and dollars. Thus, on this issue we hold the trial court's findings are not supported by the record.

## IV

Importer contends that the trial court erred in holding the contract required Distributor to purchase 3000 machines per year. Paragraph 4, on page 2, of the 1971 contract provides in its entirety:

"Distributor agrees that the volume purchases of Bernina sewing machines from Importer for distribution in the Area for the year 1971, shall represent an increase of 10% over the purchases of Bernina sewing machines for distribution in the Area for 1970, and that the purchases of Bernina sewing machines for distribution in the Area for each year thereafter shall represent an increase of 10% over the prior year. However, in the event the Factory reduces the supply of machines below the 10% yearly increase or the 'cost of living index' for the California area as issued by the United States Department of Labor decreases in any given period, then the provisions of this paragraph shall be reduced by the amount of said reduction or eliminated entirely if said reduction or decrease is 10% or greater for the same period of time the index reflects such reduction. By way of example only, if the cost-of-living index decreases 2% then Distributor shall be required to increase its purchases by 8%."

(Ex. 1).

In October 1971 the parties made several amendments to the contract, including the following:

"Paragraph 4, Page 2: Shall be amended to read as follows:

Distributor agrees that the volume purchase of Bernina sewing machines from Importer in the area for the calendar year, commencing and including 1972, shall be at least 3,000 Bernina sewing machines, all models included as manufactured by FRITZ GEGAUF, LTD."

(Ex. 3).

The amendment appears to have resulted from Distributor's extraordinarily high number of orders (5000 machines) during the year. Importer maintains that the contract and amendment provide that Distributor would be required to order 3000 machines in 1972, and that an additional 10%

would be required for each subsequent year. The court determined that the amendment completely superceded the original terms of paragraph 4, so that 3000 was the base figure for each year. We agree with the trial court that there is no evidence in the contract itself showing the amendment was intended to change only a part of the original paragraph. The preface to the amendment indicates an entire replacement of the original contract is contemplated. Other provisions in the "Amendment to Agreement" show the parties knew how to amend part of a whole—*e. g.,* the amendment of paragraph 23 provides the "[f]irst paragraph shall be amended to read as follows." The statement in the amendment "for the calendar year, commencing and including 1972," though not free from ambiguity, seems to indicate a succession of years by using the word "commencing." The parol evidence before the court was conflicting. The amendment as first proposed indicated 3000 purchases "for *each* calendar year, commencing and including 1972." (Ex. 53.) It was not clearly erroneous for the trial court to conclude the parties intended 3000 machines were the required minimum for 1972 and each following year.

### V

■ The final error alleged by Importer is the trial court's determination that no interest was due on the sewing machines left by Distributor in a warehouse for over six months. The contract provides that no machines could be taken from the warehouse prior to payment, and that no machines may remain in the warehouse over six months. Importer argues that Utah Code Ann. § 15–1–1 (1973), providing for 6% interest on loans and the forebearance of money, entitles it to collect interest.

The trial court concluded the actions of Distributor were not sufficient to find a breach of contract and that notice of the breach, which was not timely given, was a prerequisite in any case. (Tr. 1388–89.) The contract provides that in the event Distributor fails to perform on any of its terms, covenants, or conditions, "Importer

shall notify Distributor of the nature of such failure by certified mail and shall allow Distributor sufficient time (in no case less than 10 days) to correct or cure such failure." (Ex. 1.) The record indicates Distributor made late withdrawals on occasion for about four years prior to this lawsuit. It was never billed for interest nor notified interest was owing until April 30, 1975, after this suit was commenced. Importer argues that the debt arises under operation of law and, thus, its failure under the contract to give notice of the nonperformance should not affect its right to collect interest. We agree with the trial court that no debt could arise under the statute until a breach of contract occurred. It is arguable there was no breach, that the parties themselves construed the contract as not calling for interest if the six months was exceeded. In any event we agree that a prerequisite to assertion of the claim for interest was notice of nonperformance and an opportunity to withdraw the machines rather than to incur liability for interest under the contract.

This case is affirmed in all aspects except as to the calculation of profit margins upon introduction of new models; as to that aspect the case is remanded for further proceedings consistent with our holding in Part III of this opinion.