517 F.Supp. 440 (1981)
In the Matter of WESTINGHOUSE ELECTRIC CORPORATION URANIUM CONTRACTS LITIGATION.
FLORIDA POWER AND LIGHT COMPANY, Plaintiff,
v.
WESTINGHOUSE ELECTRIC CORPORATION, Defendant.
MDL-235. Civ. A. No. 75-1677-R.
United States District Court, E. D. Virginia, Richmond Division.
June 25, 1981.
*441 *442 Alvin B. Davis, Dwight Sullivan, Steel, Hector & Davis, Paul J. Bonavia, Miami, Fla., for plaintiff.
William R. Jentes, Kirkland & Ellis, Chicago, Ill., John S. Battle, Jr., McGuire, Woods & Battle, Richmond, Va., Robert F. Pugliese, Pittsburgh, Pa., Alan G. Greer, Sherryll M. Dunaj, Roger G. Wilson, Bruce A. Christensen, Marvin E. Chavis, Floyd, Pearson, Stewart, Richman, Greer & Weil, P.A., Miami, Fla., for defendant.

*443 MEMORANDUM
MERHIGE, District Judge.
The instant issue arises out of an alleged breach by the defendant Westinghouse Electric Corporation (Westinghouse) of a contract executed by the parties in May of 1966 with an effective date of November 15, 1965, for the long term fueling of two nuclear steam supply systems manufactured by Westinghouse for the plaintiff corporation. The contract in issue was entered into as a consequence of plaintiff having, in the same year, agreed to purchase from defendant two nuclear steam supply systems for the generation of electric power.
Plaintiff Florida Power and Light Company (Florida) is a corporation organized and existing under the laws of the State of Florida, with its principal place of business in Dade County, Florida, engaged as a public utility for the generation, transmission, distribution and sale of electric energy.
Westinghouse is a multinational diversified corporation organized and existing under the laws of the Commonwealth of Pennsylvania with its principal place of business in Pittsburgh, Pennsylvania.
The amount in controversy exceeds, exclusive of interest and cost, the sum of $10,000. Jurisdiction is premised on 28 U.S.C. § 1332(a).
Florida seeks, in addition to monetary damages, an order requiring Westinghouse to comply with Section 27(a)(2) of the contract of May 1966 which reads as follows:
Section 27. Scope
(a) Westinghouse will:
(1) ...
(2) Remove the irradiated fuel from the plant site and dispose of it as Westinghouse sees fit....
On September 2, 1975 Westinghouse advised Florida by letter[1] that it had no plans to remove the irradiated (spent) fuel[2] from Florida's plant site, and this lawsuit followed.
The evidence reveals that in 1965 the nuclear industry was at an early stage in its evolution. In 1964 legislation had been enacted permitting, for the first time, private ownership of uranium, a necessary component of nuclear power. The sale of nuclear steam supply systems was in its infancy, and Westinghouse, a manufacturer of such systems, was most anxious to enter into a contract with Florida for its proposed plants designated as Turkey Point Units 3 and 4, located in Dade County, Florida. At the time, there were no nuclear plants operating in the south. Additionally, the opportunity was unique; for Florida contemplated the construction of two power plants at the same location. It was during a period when fossil fuels were relatively inexpensive, capital costs were down, and adequate gas, oil and other fuels were available. While the potential for nuclear powered plants for the production of electricity was considered bright, reactor sales were not abundant and few negotiations for nuclear power plants were in progress. Additionally, in the view of many, uncertainty existed during the period of 1965-66 as to whether nuclear power could compete economically in most areas of the country with fossil fuels.
The securing of a contract by Westinghouse with Florida for the sale of two pressurized *444 water reactors was viewed by Westinghouse not only as a vote of confidence, but as an incentive for other utilities to seriously consider the use of nuclear power.
Florida, at the time, had no expertise in nuclear power, a fact well known to Westinghouse. Indeed, in March of 1965 Florida notified Westinghouse that it (Florida) lacked the manpower and knowledge needed to develop specifications and evaluate proposals for a nuclear plant. This lack of expertise resulted in Florida's continued insistence on the purchase of a complete package with a guaranteed maximum price. The evidence further reflects that Westinghouse actually encouraged Florida to rely on Westinghouse's professed nuclear knowledge and capability.
Ironically, Westinghouse was aided in inducing Florida to enter into the contracts by the fact that General Electric, a principal competitor, was also proposing that Florida convert to nuclear power, and in this effort provided much economic analysis tending to show its advantages. The competition between General Electric and Westinghouse was keen, and the form of Westinghouse's offer to Florida was influenced by its knowledge of General Electric's proposal. Westinghouse concluded that the form of its fuel offer, though not as it would have chosen in the absence of its knowledge of General Electric's position, was necessary in order to secure the contract. Coupled with this incentive was Westinghouse's knowledge that Florida's chief executive officer had expressed the view that the successful manufacturer of the contemplated units would have to assume responsibility for total fuel supply. He expressed the view most vividly in the following language:
I do not want to buy a sheep to get a suit of clothes, and have the sheep sheared, dyed, treated, woven into cloth, cut, and sewn into a suit. I want to buy a suit, not go through all the procedures of having to acquire the wool that goes into the suit, nor the manufacture of the thread, nor the material or anything else. I want to buy a suit already made.
Florida's continued insistence on guaranteed fuel costs, for as long a period as possible, together with the extreme importance Westinghouse placed on obtaining the construction contracts, prompted Westinghouse's offer of a guaranteed ten year fuel cycle cost. This, of course, included the cost of uranium and the purchase and disposal of the spent fuel as a part of the fuel cycle.[3] In short, Florida expressed a consistent desire to look at a complete package.
The cost assumptions upon which Westinghouse predicated its proffered fuel contract were based on what one witness described as "very little knowledge". In its contract with Florida, Westinghouse agreed to a contract price fixed solely by reference *445 to the amount of electricity generated by Florida, and independent of the cost to Westinghouse of the purchase or disposal of uranium. Joseph Rengel, who was principally responsible within the Westinghouse organization for developing the terms of Westinghouse's fuel proposal to Florida, quite candidly testified that under the mills per kilowatt hour formula used in the contract between the parties, the risks taken by Westinghouse encompassed "the reprocessing of the fuel at the end of the project". Mr. Rengel's explanation for Westinghouse's assumption of the risks inherent in a long term, fixed price fuel contract was that Westinghouse assumed "that the risks were not very significant". Indeed, the evidence reflects that it was not until after the contract had been executed that Westinghouse examined in detail the fuel cycle, consisting of enrichment, conversion and reprocessing.[4]
Under the provisions of the contract, Florida had the right until "initial criticality" to elect one of three fuel purchase options. Initial criticality occurred at Turkey Point Unit 3 on October 20, 1972 and at Turkey Point Unit 4 on June 11, 1973. Under the option timely selected by Florida, option C, which includes the contested Section 27(a)(2), Westinghouse is required to furnish fuel until each plant goes off the line or "the first refueling after ten years from the date of initial criticality". Under that option Florida's obligation to pay for the power generated by the fuel it received began with "initial criticality", which is defined as the first time a self-sustaining chain reaction occurs in the core of a nuclear unit. It is a moment that may be determined with technical precision. It is an event which occurs only once in the life of a nuclear unit.
In its negotiations, Westinghouse endeavored, unsuccessfully, to convince Florida that its fuel cost would be lower if it undertook on its own to have the spent fuel reprocessed. Indeed, at one point Westinghouse offered to act as Florida's agent in obtaining reprocessing. Florida never seriously entertained these suggestions, by virtue of its negotiator's insistence that it wished to purchase a complete package.
In view of the infancy of the commercial market in uranium at the time of the negotiations with Florida, Westinghouse had no way of determining whether the wholesale price index would be an accurate measure of increases in the price of uranium, yet it agreed to a specified price[5] in reference to the cost to Florida for fuel based upon mills per kilowatt hour as a charge for the energy generated.[6]
Westinghouse had full knowledge of Florida's hesitancy to use nuclear power but ultimately convinced Florida that the capital, fuel, and production costs of nuclear power would not exceed the costs that it was incurring for its fossil units, and would inure to the benefit of Florida's rate payers. Under the option which it exercised, if spent fuel were not reprocessed, Florida ran little risk, and though the parties contemplated *446 that Westinghouse would remove the spent fuel and reprocess it, the contract by its terms requires Westinghouse to remove the spent fuel and "dispose of it as Westinghouse sees fit". Indeed, no witness for either party ever viewed Westinghouse's contractual obligation as encompassing a reprocessing of the irradiated (spent) fuel.
Reprocessing is, according to those knowledgable in the nuclear power industry, the appropriate method of disposing of spent nuclear fuel. Absent reprocessing, spent fuel is not only valueless, but represents a financial burden.
It is obvious to the Court that Westinghouse took a calculated risk in providing the guarantees demanded by Florida. Included in those guarantees was Westinghouse's obligation to remove the spent fuel. To a great extent Westinghouse's willingness to accept the risks involved was premised on its understandable desire to enter into a contract for the building of Florida's nuclear reactors. Additionally, a not insignificant consideration was that Westinghouse anticipated that the reprocessing of the spent fuel, with its consequent recovery of uranium nitrate and plutonium nitrate, would result in a financial gain to it of between sixteen and nineteen million dollars, as the estimated value of reusable uranium and production of plutonium. While the given dollar value was simply an estimate on the part of Westinghouse, unsupported by hard evidence or reference to sources with a background of precise costs or values, the Court is satisfied that Westinghouse in its business judgment concluded that there was substantial value to it in reprocessing. Of necessity, the contract price also encompassed a charge to Florida for Westinghouse's anticipated service in removing the spent fuel.
The Court concludes that while both parties understood that Westinghouse intended to reprocess the spent fuel if it would inure to Westinghouse's benefit, that fact, excepting for its effect on the price Westinghouse offered to charge for the energy which Florida was purchasing, had no influence on Florida's executing the contract.
The only reference to reprocessing in the final contract is a provision permitting Westinghouse to use "plutonium and reprocessed or depleted uranium in fuel loadings subsequent to the initial fuel loading...."[7]
Florida, unwilling to tie itself to reprocessing, was told by Westinghouse that as a consequence it was committing to pay a higher price for its fuel. In this regard, Westinghouse pointed out to Florida that it was its view that Florida's cost would be less if it would reprocess the spent fuel; for reprocessed fuel, which under the contract Westinghouse had the right to use in Florida's reloads, was contemplated to be less expensive than mined uranium. Nevertheless, Florida rejected a risk factor which Westinghouse was willing to take. The most logical conclusion in light of the nature of the negotiations is that Florida viewed Westinghouse's willingness to remove and dispose of the irradiated or spent fuel as inuring to Florida's benefit in the cost of energy and the completion of the "suit of clothes". That Westinghouse contemplated reprocessing, in light of its statements to Florida reference the beneficial economics of same, was simply viewed by Florida as a factor to which Westinghouse gave more weight than Florida was willing to, especially in view of Florida's desire to have the limits of its responsibilities and concomitant costs precisely defined. As one of counsel suggested, Westinghouse was, at least as to any risk factors, simply "out-negotiated". The Court finds no evidence which would support a conclusion that the parties ever understood or intended that Westinghouse be contractually obligated to reprocess the spent fuel. One would be hard pressed to construe the phrase "... dispose of it as Westinghouse sees fit" as imposing a duty to reprocess.
Admittedly, although the possibility was present in the contract, Westinghouse, having *447 offered three options to Florida, had no way of knowing until Florida selected option C in 1972 that it, Westinghouse, would in fact have responsibility for removal of the spent fuel.
Option A of the contract would have foreclosed any responsibility on the part of Westinghouse to remove the spent fuel  options B and C placed that responsibility on Westinghouse.
Under the terms of the unaccepted options, reprocessing would have had a direct calculable affect on the cost to Florida. Florida concluded, however, that while its cost might be lower, reprocessing of spent fuel, which had never been done on a commercial basis, was too speculative, and while it agreed that Westinghouse could use reprocessed fuel in the Turkey Point plants if it chose to do so, the cost to Florida under option C was unaffected.
There can be no doubt but that at the time of the execution of the contract Westinghouse's primary interest was to build the nuclear reactors for Florida, with its concomitant boostering effect for the nuclear industry.
While, as the Court has concluded, both parties contemplated reprocessing, the fact remains that Westinghouse accepted the responsibility of removing the spent fuel and with that responsibility, to utilize that fuel as it saw fit. Its reliance on its own business judgment cannot in fairness impose on Florida greater burdens than it contracted for, absent what might be imposed by law, to which the Court addresses itself, infra.
That Westinghouse anticipated a monetary value is obvious. That Westinghouse took a calculated risk is just as obvious. No spent fuel had ever been commercially reprocessed as of the time of execution of the contract, and further, the first commercial reprocessing plant in the United States was not licensed until April 19, 1966; more than a year after negotiations between the parties had commenced. Additionally, Westinghouse fully understood that its offer to Florida was premised on what it deemed to be a reasonable business risk that commercial reprocessing would come to pass and would be economically feasible, conditions which had not, at the time of execution of the contract, been demonstrated. Florida, on the other hand, had its "suit of clothes" and had no financial interest in the spent fuel.
In short, Westinghouse was, in its eagerness to construct the power plants, willing to accept risks which Florida was not willing to take.[8] That Westinghouse fully appreciated this fact is evidenced by a Westinghouse proposal of November 3, 1965, which would effectively have placed responsibility for spent fuel on Florida, as well as the fact that other written suggestions of Westinghouse making reference to "reprocessing" were not incorporated into option C of the final contract. Florida simply refused to tie its cost to what it deemed at the time to be uncertain technology.
Except for eighteen spent fuel assemblies which Westinghouse arranged to be removed and which were sent to a governmental agency for experimental programs, Westinghouse has not removed the spent fuel, and as a consequence Florida at time of trial was storing 411 spent fuel assemblies.
*448 The evidence discloses that over the life of the contract a total of 981 spent fuel assemblies will be generated. While no schedule for the removal of the spent fuel is set out in the contract, the Court finds that it was the intention of the parties that same be accomplished within six months to a year after the spent fuel is removed from the reactors, and as a consequence of Westinghouse's failure to remove same, Florida was compelled to expand its spent fuel storage pits to accommodate excess spent fuel.
Florida had, in anticipation of both temporarily storing spent fuel assemblies and in the event a problem occurred in the reactor vessel requiring an unloading of an entire core of fuel assemblies, caused to be constructed a storage pit for each reactor, each capable of holding 217 assemblies. The original expectation was that the pits would be sufficiently large enough to handle not only the anticipated annual discharge, but emergency unloadings as well. Each pit was intended for interim, temporary storage for the period between the time the fuel was taken out of the reactor and the time it was cool enough to be removed from the plant's site by Westinghouse. Had Florida not expanded its spent fuel storage pits, its operation of the nuclear units would have had to cease.
As a consequence of Westinghouse's refusal to remove the spent fuel assemblies, Florida has expended $9,473,242.04 in reracking  that is, adding additional spent fuel storage racks at a closer center-to-center spacing which permits each pit to have a larger capacity than contemplated in the original design. This of course has resulted in increased operating and maintenance costs, as well as potential environmental difficulties.
It is estimated that by the end of the year 1985 both storage pits will reach their potential capacity for storage. If such comes to pass, Florida's reactors will be forced to shut down with a consequent cost estimated to be approximately $500,000 per day, per unit, for replacement power.
While the government has announced plans to provide an interim storage facility during the 1980's, no capacity for a final disposal facility has been demonstrated, nor indeed is there any certainty that even the interim storage facility will come to pass.
Florida chose what it deemed to be a fixed cost contract and as a part thereof, Westinghouse was to remove the spent fuel and dispose of it as Westinghouse saw fit. That conclusion, in the Court's view, is unassailable.
Finally in this regard, it can be said that the evidence reflects that Westinghouse's entry into the contract came about at a time when Westinghouse fully anticipated, despite the lack of a binding contract for reprocessing of spent fuel, to reprocess Florida's spent fuel with the hope of making its agreement with Florida under option C economically more profitable. Such anticipation was, however, just that  an anticipation fueled by its desire to secure the contract for the building of two nuclear steam supply systems and its own enthusiasm for its view of the merits and future of nuclear power.
Regardless of how one views the business judgment of Westinghouse in this regard, the fact is that, as early as 1957 the United States Atomic Energy Commission adopted a policy of assuring the nuclear power industry that the government would, in the event that commercial reprocessing services were not available at reasonable times and conditions when irradiated power reactor fuels were discharged from their reactors, make financial settlement for the materials contained in those fuel elements, and reprocess them. Indeed, in 1965 the Government was actively urging reprocessing of spent fuel, was accepting fuel for reprocessing, and to a limited extent was underwriting a portion of the financial burden associated therewith. Notably, however, at that period in time the uranium was leased by the government and was in fact government material.
As a consequence of this policy of encouragement, reiterated in January of 1968, a number of companies expressed interest, and at least one, National Fuel Services, Incorporated, built a plant which became operational in 1966, and operated until 1972.
*449 It is to be noted, however, that the plant which became operational in 1966 was designed to operate at only about 300 tons per year. It is estimated that the Turkey Point plants will produce about 400 tons of spent fuel over the term of the contract with Westinghouse. Other companies, such as General Electric, which had expressed an interest in commercial reprocessing services, abandoned their plans.
Events occurring after formation of the contract, however, made Westinghouse's plans to reprocess  rather than merely remove  and dispose of Florida's spent fuel more difficult to accomplish than Westinghouse had anticipated. After the start of the small NFS reprocessing plant in 1966, no other commercial reprocessing concerns became operable. In 1970, four years after the execution of the contract, Westinghouse entered into a letter of intent with Allied-General Nuclear Services (AGNS), to contract with AGNS, subject to AGNS's receipt of a license, for the reprocessing of the Turkey Point spent fuel. At the time of the letter of intent, AGNS was not licensed to reprocess nuclear fuel; nor is it now. AGNS never executed a formal contract with Westinghouse, and in fact, in early 1974 AGNS advised Westinghouse that it was not prepared to execute a formal agreement. On September 2, 1975, Westinghouse notified Florida by letter that Westinghouse had no plans for removing the spent fuel from the Turkey Point site. Westinghouse assigned as its reason for not removing the spent fuel, the fact that the schedule for removing and reprocessing the discharged fuel was "of course, dependent on the Allied-General Services' reprocessing schedule".
No stretch of the imagination nor the arguments of ingenious counsel could satisfy the Court that, regardless of whether reprocessing was an integral part of the contract, Florida ever agreed to condition Westinghouse's obligation to remove the spent fuel on "Allied-General Nuclear Services' (AGNS) reprocessing facility schedule".
In April 1977, two years after Westinghouse declared its unwillingness to fulfill the contract, President Carter, by Executive Order, precluded the development of domestic facilities for the commercial reprocessing of nuclear fuel and the exportation of nuclear fuel for reprocessing purposes. As a consequence of the presidential ban on reprocessing, licensing procedures for contemplated commercial reprocessing facilities have been terminated.
Two years after Westinghouse's breach, occurring because of its own failure to successfully negotiate a contract for the removal and storage of the spent fuel, or alternatively to have utilized the period between the date of Florida's exercise of Option C and its breach in 1975 to make other arrangements, the government's change of policy thwarted Westinghouse's hope for reprocessing. As a consequence of the ban on reprocessing, Westinghouse contends that it is faced with an effective bar to removal of the spent fuel.
Inexplicably, though Westinghouse introduced evidence to the effect that it and AGNS had reached a finalized agreement reference the removal and reprocessing of the spent fuel as early as March 1973, no action was taken, nor has any since been taken, by Westinghouse, to enforce what it contends was its contract with AGNS. The Court concludes that no action has been taken in this regard because of Westinghouse's conclusion that any such action would fail.
Absent excuse by law, justice requires that Florida not be unduly penalized for having been forced as a matter of commercial necessity brought about by Westinghouse's failure, to expend millions of dollars in expanding its storage pits.
This, however, does not end the case. Florida seeks not only monetary damages as compensation for its having to expand its storage pits, but an order directing Westinghouse to remove the spent fuel.
The evidence does reflect that as a consequence of the presidential ban on reprocessing, licensing procedures for contemplated commercial reprocessing facilities have been *450 terminated. There are, however, a number of facilities, including AGNS' Barnwell, South Carolina facility, where subject to appropriate licenses, spent fuel could be stored and perhaps ultimately reprocessed.
Finally in this regard, there are no commercial facilities, excepting for a few such as that of General Electric, which, because of the ban on reprocessing, has limited the use of its facility to taking spent fuel from its customers as an accommodation in lieu of being able to fulfill reprocessing commitments, that could be used for storage of spent fuel. Though there are eight government facilities with potential for storing spent fuel, which, theoretically, could store spent fuel produced beyond the year 2000, they would require extensive physical modifications to make them usable.
While there is now legislation pending to permit the U. S. Department of Energy to proceed to provide storage facilities, even if enacted, such facilities would not be available for a number of years.
It would appear that in the absence of a reversal of the government's policy against reprocessing or alternatively, facilities for the storage of spent fuel, if not presently available, becoming available, Florida's nuclear Turkey Point plants will be shut down by the year 1986 as to one plant, and 1988 as to the other.

LEGAL ISSUES
Westinghouse raises the following five defenses: (1) that its nonperformance is excused by the common law doctrine of impossibility of performance; (2) that the government's change of policy concerning commercial reprocessing discharges its duty under the force majeure clause; (3) that performance by it has been rendered commercially impracticable under § 2-615 of the Uniform Commercial Code; (4) that the non-availability of reprocessing has frustrated the purpose of the contract; and (5) that the parties' erroneous expectation that the spent fuel would be reprocessed discharges Westinghouse's obligation under the doctrine of mutual mistake.
Both in conceptual terms and in terms of the facts to which they relate there is considerable similarity among the defenses, particularly defenses 1, 3, 4, and 5. Commercial impracticability under the UCC is basically a codification of the common law doctrine of impossibility of performance, which, in turn, is grounded in the doctrines of mutual mistake and frustration of purpose. The purpose of each of the defenses is to
... discharge an obligor from his duty to perform a contract where a failure of a basic assumption of the parties produces a grave failure of the equivalence of value of the exchange to the parties. And all [of the defenses] are qualified by the same notions of risk assumption and allocation.
Aluminum Co. of America v. Essex Group, Inc., 499 F.Supp. 53, 70 (W.D.Penn.1980). The burden of proving the elements of each of these defenses is on the party seeking to avoid performance. Ocean Air Tradeways, Inc. v. Arkay Realty Corp., 480 F.2d 1112, 1117 (9th Cir. 1973).
The bulk of the Court's analysis will proceed under the two most similar of the claimed defenses, common law impossibility and commercial impracticability under the UCC. The United States Court of Appeals for the Fourth Circuit has held that because the UCC did not become effective in Florida until January 1, 1967, its provisions govern only part of the contract in dispute. Florida Power & Light Co. v. Westinghouse Electric Corp., 579 F.2d 856 (1978). However, in light of the fact that the Florida Comments to the UCC indicate that the commercial impracticability provisions of the UCC merely codify the pre-code common law of impossibility of performance, the Court believes that its consolidation, for purposes of analysis, of the two defenses is fully consonant with the Fourth Circuit's holding. See Florida Power & Light, 579 F.2d at 863.

I. Commercial Impracticability

Fla.Stat. 672.615 (excuse by failure of presupposed conditions) provides, in pertinent part: *451 Except so far as a seller may have assumed a greater obligation and subject to the preceding section on substituted performance:
(1) delay in delivery or non-delivery in whole or in part by a seller ... is not a breach of his duty under a contract for sale if performance as agreed has been made impracticable by the occurrence of a contingency the nonoccurrence of which was a basic assumption on which the contract was made.
Common law impossibility, formerly a very harsh doctrine which purported to require a showing of objective or scientific impossibility, has been moderated by case law to the point where it is equivalent to impracticability under the Code. The Restatement of Contracts, § 454, defines impossibility as "not only strict impossibility, but impracticability because of extreme and unreasonable difficulty, expense, injury or loss involved." Common law impossibility is frequently discussed under an "implied condition" analysis:
[W]here parties enter into a contract on the assumption that some particular thing essential to its performance will continue to exist and be available for the purpose and neither agrees to be responsible for its continued existence and availability, the contract must be regarded as subject to an implied condition that, if before the time for performance and without the default of either party the particular thing ceases to exist or be available for the purpose, the contract shall be dissolved and the parties excused from performing it.
Texas Co. v. Hogarth Shipping Co., 256 U.S. 619, 629, 41 S.Ct. 612, 614, 65 L.Ed. 1123 (1921).
In the Court's view, Westinghouse's claim of commercial impracticability raises four issues: (1) Was performance as agreed rendered impracticable? (2) Did the claimed impracticability arise from an unforeseen contingency? (3) Was the non-occurrence of the contingency a basic assumption on which the contract was made? (4) Did the parties, explicitly or implicitly, allocate the risk that the contingency would occur?
There is nothing magical about these four questions: they are not, strictly speaking, elements of proof, or hurdles which Westinghouse must cross if it is to be excused for nonperformance. They merely provide, for purposes of the instant case, a useful method for structuring the inquiry.
It is further to be noted that the issues as framed are interrelated: the "answer" to each depends in part on the "answers" to the other three. For example, as stated by Judge Skelly Wright in Transatlantic Financing Corp. v. United States, 363 F.2d 312, 319 (D.C.Cir.1966), "a willingness [on the part of the promisor] to assume abnormal risks ... should legitimately cause us to judge the impracticability of performance ... in stricter terms than we would were the contingency unforeseen." The interrelated nature of the issues involved might best be illustrated by comparing a fact pattern held to excuse nonperformance with one where the claim of impracticability proved unsuccessful.
Two very similar cases excusing nonperformance are Kansas City v. Kansas City, 393 F.Supp. 1 (W.D.Mo.1975) and Vernon v. Los Angeles, 45 Cal.2d 710, 290 P.2d 841 (1955). In each, one city agreed to receive and dispose of sewage for another city. Supervening events occurred  in Vernon, an abatement injunction, and in Kansas City, the passage of federal water pollution laws  which prevented the promisors from continuing to dispose of the untreated sewage, and which required them to build treatment plants at enormous expense. The contingency was held, in both cases, to have been unforeseen and unforeseeable; the means of performance required as a result of the contingency were entirely different from the means of performance agreed to; the risk of the contingency, being unforeseen, could obviously not be viewed as bargained for or as implicitly allocated to the promisor; finally, the expense of performance had been vastly increased. In light of these factors, the courts had no difficulty in finding the promisor cities' duty discharged.
*452 By contrast, in United States v. Wegematic, 360 F.2d 674 (2d Cir. 1966) performance was held not to be excused. Defendant, a newcomer to the computer field, contracted to provide the federal government with a computer system. In soliciting bids for the project, the government stressed the importance of timely delivery. Defendant, which had described the offered system as "truly revolutionary", encountered severe engineering difficulties with its new technology, resulting in considerable delay and additional expense. In light of the fact that the promisor entered the contract knowing that the technology it intended to use was uncertain and that difficulties and added expense might occur, Judge Friendly, speaking for the Court, held that the risk of such difficulties was implicitly allocated to the computer company.
Thus, it is apparent that the four issues heretofore posited are interrelated; for purposes of analysis, however, the Court deems it helpful to address them individually.

1. Was performance as agreed rendered impracticable?
Westinghouse contends that the reversal of the government's policy concerning reprocessing, and specifically the 1977 presidential order banning commercial reprocessing, has had the practical effect of rendering performance as contemplated impracticable. At the time the contract was executed, Westinghouse expected to recoup between 16 and 19 million dollars from the spent fuel. Now, however, the fuel is virtually valueless. Thus, Westinghouse's basic contention is that the government's actions have made commercial reprocessing unavailable, which in turn has massively increased the costs of removal of the spent fuel from Florida's plants.
In so arguing, Westinghouse relies in part on the sewage disposal cases discussed supra. There, as here, it is contended, a supervening governmental action rendered performance much more expensive than was contemplated at the time of execution.
The Court finds that the facts simply do not support the conclusion that Westinghouse's performance has been rendered impracticable. The short, albeit incomplete answer to Westinghouse's contentions is the plain language of the contract. The contract in unequivocal language requires Westinghouse to remove the spent fuel. It does not by any stretch of construction require Westinghouse to reprocess. The bargained for performance was removal; reprocessing was merely an option given to Westinghouse.
While the short answer is admittedly incomplete, it is far from meaningless, as may be seen from cases in which the issue was the nature of the performance claimed to be impracticable. In Northern Corp. v. Chugach Electric Association, 518 P.2d 76 (Alaska), vacated on other grounds, 523 P.2d 1243 (1974), and later appealed, 562 P.2d 1053 (1977), defendant agreed to build a dam for plaintiff. The contract specifically required defendant to transport rock for the project by hauling it across a frozen lake. When defendant attempted to do so, the ice proved too thin to support the rock and the hauling equipment. The court rejected plaintiff's contention that performance by alternate, more expensive means remained practicable. The fact that the means of performance was not only contemplated by the parties, but was, unlike the instant case, specifically provided for in the contract, relieved defendant from any obligation to perform by alternate means.
In two very similar cases, Transatlantic Financing Corp. v. U. S., 363 F.2d 312 (D.C. Cir.1966) and American Trading & Production Co. v. Shell International Marine, Ltd., 453 F.2d 939 (2d Cir. 1972), shipowners sought compensation for additional expenses incurred as a result of the fact that the Suez Canal was closed after they had begun their voyages. To reach their destinations the ships had to sail around the Cape of Good Hope, a much longer voyage than through the Suez. The shipowners claimed that the contemplated means of performance, i. e. passage through Suez, had been rendered impracticable. The courts rejected the shipowners' arguments: the fact that both parties to each of the *453 contracts contemplated the Suez route "is not at all equivalent to an agreement that it be the exclusive method of performance". American Trading, 453 F.2d at 941. Because the promises to transport cargo from one point to another were unqualified, the shippers were not relieved of the obligation to perform by alternate means when the contemplated means became impracticable.
Thus, where the contract, explicitly or implicitly, provides for an exclusive means of performance, the impracticability of the specified means may release the promisor from his duty. Where, on the other hand, the promised performance is set forth in unqualified language, as was Westinghouse's promise to remove the spent fuel, the promisor may be required to perform by alternate means when the contemplated means become impracticable.
There can be no doubt that both Westinghouse and Florida contemplated that the spent fuel would be reprocessed. But there is no indication in the contract itself or in the history of its negotiation to indicate that reprocessing was viewed as the exclusive means of performance. Indeed, reprocessing was not in actuality the contemplated "means" of performance at all; it was the contemplated disposition of the spent fuel after performance. The means of performance, of removal, were left unspecified. Further, as will be hereinafter discussed, the evidence indicates that the unqualified nature of the promise was a consciously bargained for term of the contract. Florida, in its negotiator's words, sought "a suit of clothes", without regard to the process necessary to achieve this.
Even if reprocessing could reasonably be viewed as an exclusive means of performance, or as an integral part of the exclusive means of performance, there is the additional question of whether the increased expense claimed by Westinghouse is sufficient to rise to the level of impracticability.
Promisors seeking to establish impracticability by reason of increased expense have not generally found a sympathetic ear in court. See Maple Farms, Inc. v. City School District, 76 Misc.2d 1080, 352 N.Y.S.2d 784 (Sup.Ct.1974); Gulf Oil Corp. v. FPC, 563 F.2d 588 (3rd Cir. 1977), cert. denied, 434 U.S. 1062, 98 S.Ct. 1235, 55 L.Ed.2d 762 (1978); United States v. Wegematic, 360 F.2d 674 (2d Cir. 1966). Comment 4 to the Florida U.C.C. section on impracticability provides that increased cost alone may constitute impracticability where the increase is due to an "unforeseen contingency which alters the essential nature of the performance". Generally, however, "the fact that performance has become economically burdensome or unattractive is not sufficient for performance to be excused.... We will not allow a party to a contract to escape a bad bargain merely because it is burdensome". Neal-Cooper Grain Co. v. Texas Gulf Sulpher Co., 508 F.2d 283, 293-294 (7th Cir. 1974). The strictness of this rule is based on a number of considerations: the fact, for example, that the very purpose of a fixed price agreement is to place the risk of increased costs on the promisor (and the risk of decreased costs on the promisee). Further, enforcing the bargain struck encourages parties to attempt to foresee cost variations, and to structure their agreements accordingly.
Without doubt, the sum which Westinghouse is precluded from recouping as a result of the unavailability of reprocessing is substantial. But impracticability by reason of additional expense is not to be determined by reference to the loss, or failure to profit, from one particular contract term in isolation. Rather, it is to be judged from the perspective of the entire undertaking. Eastern Air Lines v. Gulf Oil Corp., 415 F.Supp. 429 (S.D.Fla.1975); United States v. Wegematic, 360 F.2d 674 (2d Cir. 1966). There has been no showing that Westinghouse lost money on the entire "package deal" of plant and fuel contracts for Florida. Further, Westinghouse sought benefits beyond whatever profits it may have anticipated from the contracts: it clearly hoped that the Turkey Point plants would demonstrate the benefits of nuclear power, and would promote its own position in the industry.
*454 Admittedly, the additional cost of removal itself might be sufficient to constitute impracticability in another context. As will be discussed infra, however, the Court believes that to the extent that Westinghouse was aware of the uncertainties of reprocessing, it assumed the risk that reprocessing would prove to be more expensive than anticipated, or not available at any price.

2. Did the claimed impracticability arise from an unforeseen contingency?
The success of a commercial impracticability defense often turns on whether the promisor foresaw, or should have foreseen, the contingency claimed to have made performance impracticable. Where the promisor had no reason to anticipate a supervening event which radically increases the difficulty of performance, or which renders performance impossible, it is manifestly unfair to hold him to the agreement. For instance, a seller of produce may be relieved because of a total crop failure. Mitchell Canneries, Inc. v. United States, 77 F.Supp. 498 (Ct.Cl.1948). Conversely, where the contingency may reasonably be said to have been foreseeable, courts have generally taken the view that the promisor should not be released from his obligation. This rule is based on the notion that where the parties can reasonably anticipate events that may affect performance, the prudent course is to provide for such eventualities in their contract.
Because the future is by definition unknowable, a rule holding the obligor to performance only where he foresees, but fails to guard against, the precise event that renders performance more difficult, would be meaningless. As may be seen from the following cases, it may be enough that he is (or should be) aware of a certain trend, or that a given state of affairs is in flux, or that an assumption is more than usually uncertain.
In Eastern Air Lines v. Gulf Oil Corp., supra, the parties entered a requirements contract for jet fuel. They attempted to guard against price fluctuations through an escalator clause, which tied the price paid by Eastern for jet fuel to published prices of a certain type of domestic oil. In the year following the execution of the contract, the price of foreign oil rose substantially as a result of OPEC actions, including the 1973 embargo. In response, the United States government sought to control oil prices by implementing a "two tier" pricing system. The indicator oil chosen by the parties was in the lower tier, and its price rose far less rapidly than did Gulf's oil costs.
The court held that Gulf's performance had not been rendered commercially impracticable. While Gulf could not reasonably have anticipated the embargo, the precise effect that OPEC's actions would have on worldwide oil prices, or the advent of the two tier pricing system, it was aware of the volatility of affairs in the Middle East, of the constantly changing government price regulations, and of the general upward trend in oil prices. As one witness in that case stated, "the handwriting was on the wall". Therefore, even though the indicator chosen did not accomplish its intended purpose, in that it proved to be a very poor measure of Gulf's costs, the contract was enforced.
The analogies to the instant case are manifest. It is a fact that government policy favored reprocessing at the time the contract was negotiated; it is also a fact that, just as Gulf could not anticipate the two tier pricing system, Westinghouse could not have anticipated in 1966 that eleven years later President Carter would ban commercial processing. But while Westinghouse could not have foreseen the precise eventuality claimed to excuse performance, its officers certainly knew that commercial reprocessing was, at best, a highly uncertain proposition. In fact, as a practical matter, there was no such thing as commercial reprocessing in 1966. Westinghouse's claim that the unavailability of reprocessing was an unforeseen contingency is belied by the fact that, even at the time the contract was executed, reprocessing for Florida's anticipated spent fuel was, for all practical purposes, unavailable.
*455 Further, Westinghouse cannot, in the Court's view, rely on the 1977 presidential order banning commercial reprocessing as an excuse for its consistent refusal to perform beginning two years earlier. The unavailability of reprocessing or storage for Florida's spent fuel prior to 1977 is clearly attributable, at least in part, to Westinghouse's own less than zealous attempts to obtain a facility. Apart from the drawn out, ultimately unsuccessful negotiations with AGNS, Westinghouse made no significant attempts to secure storage or reprocessing facilities, and gave little, if any, serious consideration to building its own facility, in spite of its knowledge that failure to remove the spent fuel could ultimately result in a shut-down of the plants.

3. Was the nonoccurrence of the contingency a basic assumption of the contract?
Westinghouse, pointing to the abundant evidence that both parties contemplated reprocessing, and to the fact that the price per kilowatt hour was calculated on the assumption that Westinghouse would obtain considerable value from the spent fuel, argues that the availability of reprocessing was a fundamental assumption of the contract, and therefore a condition of performance.
The Court finds, however, that notwithstanding the parties' expectation that reprocessing would occur, there is nothing in the evidence to evince any intention that Westinghouse was to be absolved from its responsibility to remove the spent fuel in the event that reprocessing would not be available. Indeed, it is difficult to discern how the availability of reprocessing could have been a basic assumption of the parties, given the fact that commercial reprocessing did not exist at the time the contract was executed, as well as the fact that the contract specifically calls for Westinghouse to do with the spent fuel as "it sees fit".
If there was a basic and mutual assumption in this regard, it was that Florida would have no involvement whatever with reprocessing, or with whatever alternate disposition Westinghouse might make of the spent fuel. Florida deemed reprocessing too speculative to undertake it. In light of Florida's rejection of formulas which tied its costs to reprocessing, it is inconceivable that Florida would have agreed to a term conditioning Westinghouse's performance on the availability of reprocessing.
Certainly, as the Court has found, the bargained for price per kilowatt hour reflected the parties' anticipation that the fuel would be reprocessed. This, however, is not sufficient to transform an expectation into a basic assumption or a condition of performance. Arguments akin to that urged by Westinghouse in this regard were rejected in the Suez closing cases. In American Trading and Pro. Co., supra, the shipowner contended that because the shipping rate was based on a Suez passage, the availability of that route was a basic assumption of the contract. The court responded that "all that the ... rate establishes is that the parties obviously expected a Suez passage but there is no indication at all in the instrument or dehors that it was a condition of performance". 453 F.2d at 942. Here, not only is there an absence of evidence that reprocessing was a condition of performance, there are positive indications that the unqualified promise to remove the spent fuel was bargained for, and that reprocessing was a subject left entirely to Westinghouse. These facts are radically inconsistent with the contentions made by Westinghouse.

4. Did the parties, explicitly or implicitly, allocate the risk that the contingency would occur?
Generally, the risk of a contingency affecting performance is placed on the promisor: "he is presumed, in the absence of evidence to the contrary, to have agreed to bear any loss occasioned by an event which was unforeseeable at the time of contracting". Eastern Air Lines v. McDonnell Douglas Corp., 532 F.2d 957 (5th Cir. 1976). Comment 8 to Section 2-615 of the U.C.C. explains that the defense of commercial impracticability is not available where the risk may be deemed to have been allocated to the promisor:

*456 The provisions of this section are made subject to assumption of greater liability by agreement and such agreement is to be found not only in the expressed terms of the contract but in the circumstances surrounding the contracting, in trade usage, and the like. Thus the exemptions of this section do not apply when the contingency in question is sufficiently foreshadowed at the time of contracting to be included among the business risks which are fairly to be regarded as part of the dickered terms, either consciously or as a matter of reasonable, commercial interpretation from the circumstances.
The types of factors relevant to a determination as to whether a given risk has been allocated to a party are well set forth in Maple Farms, Inc. v. City School District, 76 Misc.2d 1080, 352 N.Y.S.2d 784 (Sup.Ct. 1974). There, as a result of a substantial increase in the price of milk, a dairy sought to be relieved of a contract to sell milk to a school district at a fixed price. The court stated that even if it were to view the specific circumstances (sale of wheat to Russia, poor crops, market conditions) urged by the dairy as "unforeseen contingencies", the dairy would nonetheless be bound because of the many indications that it had implicitly assumed the risk of a price rise:
Here the very purpose of the contract was to guard against fluctuations of price of half pints of milk as a basis for the school budget. Surely had the price of raw milk fallen substantially the [school district] could not be excused from performance. We can reasonably assume that [the dairy] had to be aware of escalating inflation, it is chargeable with knowledge of the substantial increase of the price of raw milk from the previous year's low. It had knowledge of the fact that for many years the Department of Agriculture had established the price of raw milk and that that price varied. It nevertheless entered into the agreement with that knowledge. It did not provide in the contract any exculpatory clause to excuse it from performance in the event of a substantial rise in the price of raw milk. On these facts the risk of a substantial or abnormal increase in the price of raw milk can be allocated to the [dairy].
352 N.Y.S.2d 784, 790.
Thus, risk allocation is determined by the totality of the circumstances, including the comparative abilities of the parties to make informed judgments as to the extent of the risk; each party's interest in avoiding the risk; and the extent to which that interest was a factor in the negotiation of the contract. As indicated by the Comment, the foreseeability of the risk alone may well be sufficient for it to be regarded as implicitly assumed by the promisor.
Here, the record is replete with indications that Westinghouse, and not Florida, assumed the risk of any difficulties that might arise concerning reprocessing. As it made abundantly clear to Westinghouse throughout the negotiations, Florida, a public utility, had a strong interest in a lowrisk, fixed price contract. Indeed, "strong interest" is too mild an expression: Florida's position throughout was that it would not agree to anything other than its finished "suit of clothes". Florida required, and Westinghouse agreed, that the means by which the "suit of clothes" would be made was to be left entirely to Westinghouse. As noted earlier, Florida's rejection of options under which the price of the fuel would depend on reprocessing renders it inconceivable that it would have accepted a contract term under which Westinghouse's performance was contingent upon the availability of reprocessing.
Westinghouse, by contrast, was in an entirely different situation as it met Florida across the bargaining table. As a giant in the then-nascent nuclear industry, it had a powerful interest in promoting both the viability of nuclear power, and its own position in the industry. In light of Florida's requirements, and of Westinghouse's knowledge that General Electric was actively seeking the contract, Westinghouse's goals, as it perceived them then, could not be achieved without taking substantial risks  the availability and cost of reprocessing *457 being just one of many. Westinghouse was certainly in a position to know of the uncertainties, both technological and commercial, of reprocessing. Indeed, at the time it entered the contract, Westinghouse had not yet conducted a detailed study of the fuel cycle.
Knowing full well Florida's requirements, and knowing that reprocessing, not being available even then as a practical matter, was highly uncertain, Westinghouse agreed to a contract term which in plain, unequivocal, unqualified language, required it to remove the spent fuel from Florida's plants. If this is not assumption of risk, the Court confesses itself unable to discern what would be. Whatever opinion one might hold as to Westinghouse's wisdom in agreeing to such a term, it did agree to it. There is nothing to indicate that the language of the term did not reflect the parties' intentions. On the contrary, all of the evidence, including the history of the negotiations and the parties' interests and goals in entering into the contract, indicate that the unqualified promise made by Westinghouse to remove the spent fuel was precisely the bargained for performance.

II. Mutual Mistake

Westinghouse contends that the parties made two related assumptions: that reprocessing would be available, and that the spent fuel had value. These assumptions having proven to be erroneous, Westinghouse argues that its performance is excused under the doctrine of mutual mistake.
Section 294 of the Restatement of Contracts 2d provides as follows:
(1) Where a mistake of both parties at the time the contract was made as to a basic assumption on which the contract was made has a material effect on the agreed exchange of performances, the contract is voidable by the adversely affected party unless he bears the risk of the mistake....
Section 293 defines "mistake" as a "belief not in accord with existing facts".
It is immediately apparent that the defense of mutual mistake includes two of the same elements as the doctrine of commercial impracticability: it requires the mistaken fact be as to a basic assumption, and it is qualified by the notion of risk allocation. The Court has already made findings as to these issues adverse to Westinghouse. However, in light of the magnitude of this dispute, the Court deems it appropriate to more fully address the issues as they arise under this defense.
The Court finds that the parties' anticipation that reprocessing of the spent fuel would occur was not a mutual mistake of fact, but rather an erroneous prediction. Indeed, Florida proved not to have been mistaken at all; it viewed reprocessing as too speculative a proposition to agree to any involvement in it, or to a contract under which either the price it would pay or Westinghouse's performance was in any way dependent upon it.
One recent case (decided after the parties' last briefing in this matter), Aluminum Co. of America v. Essex Group, (Alcoa), 499 F.Supp. 53 (W.D.Penn.1980), creates considerable tension in the distinction between a mistake as to a fact existing at the time the contract was executed, and an erroneous prediction of a future event. The Court addresses Alcoa not because it must distinguish it, but rather because its distinctions from the instant case are particularly enlightening.
In Alcoa, the parties entered a long term contract in which Alcoa agreed to process alumina for Essex. After a careful study, the parties developed a complex pricing formula. One component of the formula was designed to reflect Alcoa's labor costs; another component, intended to reflect Alcoa's non-labor costs, was tied to the Wholesale Price Index (WPI). The non-labor component was arrived at on the basis of a study showing that for many years, there had been a close correlation between the WPI and Alcoa's non-labor costs. However, after the contract was executed, the price of electricity, a major component of Alcoa's non-labor costs, rose enormously, far outpacing the rise in the WPI; as a result, *458 Alcoa suffered substantial losses. Essex, on the other hand, obtained considerable windfall benefits by selling the aluminum it manufactured from alumina processed by Alcoa, because the rise in the market price of aluminum also far outstripped the WPI.
The court held that the parties' belief, at the time the contract was executed, that the WPI would reflect Alcoa's non-labor costs was a mutual mistake of fact rather than an erroneous prediction of future events, and that therefore Alcoa was entitled to relief under the doctrine of mutual mistake.
While the Court has, most respectfully, some difficulty with the holding in Alcoa, it has no difficulty in finding that, even under that court's expansive reading of mutual mistake, Westinghouse's reliance on that defense is misplaced. As the Alcoa court noted, there is an important difference between conscious and unconscious ignorance of a material fact: "where parties enter a contract in a state of conscious ignorance of the facts, they are deemed to risk the burden of having the facts turn out to be adverse, within very broad limits". 499 F.Supp. 53, 68. In the instant case, there can be no doubt that the parties entered the contract in a state of "conscious ignorance" as to the technology, costs, and even the availability of reprocessing for Florida's spent fuel, as indicated by the fact that commercial reprocessing was not then readily available, and by Westinghouse's candid admission that its price calculations were based on "very little knowledge".
A passage from Alcoa is particularly instructive as to the distinction between conscious and unconscious ignorance:
[I]f parties agree to sell and purchase a stone which both know may be glass or diamond at a price which in some way reflects their uncertainty, the contract is enforceable whether the stone is in fact glass or diamond. If, by contrast, the parties both mistakenly believe it to be glass, the case is said not to be one of conscious ignorance but one of mutual mistake.
499 F.Supp. at 68. The instant case falls in the first category; Judge Teitelbaum held that Alcoa fell in the second. While the Court is convinced that the price per kilowatt hour charged to Florida was lower than it would have been if Westinghouse had known that it would not be able to reprocess, the Court is equally certain that the price was higher than it would have been had there been no uncertainty about reprocessing. Expressed another way, Westinghouse was wagering that the stone would turn out to be a diamond. That it misjudged the odds does not release it from its bargain.
A related distinction is the manner in which the mistake, or the erroneous prediction, affects the contemplated performances or the equivalence of value. To the extent that Alcoa was disadvantaged by the mistake, Essex was enriched. Here, by contrast, while the unavailability of reprocessing has the effect of making performance by Westinghouse more expensive, it in no way enriches Florida, or gives Florida any benefit it did not bargain for.
Westinghouse's own poor judgment and mistakes cannot alone excuse its performance.

III. Force Majeure

Westinghouse claims that its nonperformance is excused by the terms of the contract's force majeure clause, which reads as follows:
Section 9. Force Majeure
Except as otherwise specifically provided in this contract, neither Westinghouse nor Florida shall be liable for loss, damage, detention, or delay resulting from causes beyond its reasonable control, including but not limited to, fire, work stoppage, civil or military authority, restrictions of the United States Government, or any department, branch or representative thereof, insurrection, or riot, embargoes, car shortages, wrecks or delays in transportation, or inability to obtain necessary labor or manufacturing facilities due to such causes.
Westinghouse points to other contract provisions, which give Florida responsibility for *459 the fuel from the time that it is delivered until Westinghouse removes it. Read together, it is contended, these provisions indicate that Florida assumed the risk of having to store the spent fuel in the event that Westinghouse was unable to remove it as a result of one of the contingencies listed in the force majeure clause, and that therefore Westinghouse's performance is excused.
As noted earlier, the risk of a contingency that affects performance is presumed to rest on the promisor. However, the parties may agree to shift a particular risk to the promisee, or to allocate the various risks between them as they see fit.
For instance, in Eastern Air Lines v. McDonnell Douglas, 532 F.2d 957 (5th Cir. 1976), McDonnell Douglas urged both commercial impracticability and an "excusable delay" clause, exempting McDonnell Douglas from liability for delays beyond its control, in defense of Eastern's action for damages caused by late delivery. The late delivery was attributable to informal demands by the government that McDonnell Douglas accord priority to military aircraft for the Vietnam war. The court held that the excusable delay clause had the effect of broadening the protection afforded McDonnell Douglas under the U.C.C., and that the government's demands came within the terms of that clause.
Because of the same factors which compelled the Court to reject Westinghouse's defense of commercial impracticability, it is unable to view Westinghouse's obligation as discharged under the force majeure clause. To begin, Westinghouse's argument ignores the important fact that unlike the clause in McDonnell Douglas, which exempted only the seller, the force majeure clause at issue here protects both Westinghouse and Florida. To construe the clause as Westinghouse contends would, in effect, place the entire loss on Florida  a result not consonant with the clause itself, or with the parties' intentions concerning allocation of risk.
Further, the language of the clause is such that it is simply not applicable to the facts. The term reads "except as otherwise provided in the contract". Section 27 of the contract unequivocally places responsibility for removal of the spent fuel on Westinghouse. Westinghouse's contention that other contract terms place responsibility for the fuel on Florida until it is removed is not only misguided  it is cynical, in light of the fact that the fuel remains with Florida only because of Westinghouse's refusal to remove it. To adopt Westinghouse's construction of the phrase "until it is removed" as a valid defense to its failure to perform, in the context of the whole contract, would, in the Court's opinion, denude the law of reason.
Finally, the force majeure clause applies only to losses resulting from causes beyond the parties' reasonable control, including actions of the government. As noted in the discussion of commercial impracticability, the Court is unable to conclude that Westinghouse's failure to perform was in any meaningful way caused by the government's actions. Reprocessing, not removal from Florida's site, was rendered illegal by presidential order. No representative of the government has ever forbidden Westinghouse to transport spent nuclear fuel from Florida's spent fuel storage site to some other site; nor has any government stricture prevented Westinghouse from accepting responsibility for the spent fuel from Florida, as required by the contract. Further, the presidential order was not issued until two years after Westinghouse's initial refusal to remove the first spent fuel. Finally, in light of the fact that Westinghouse's attempts to obtain reprocessing facilities prior to the presidential order were less than aggressive at best, it has not been shown that Westinghouse's failure to obtain reprocessing during that period, much less its failure to remove the spent fuel, resulted from causes beyond its reasonable control.

IV. Frustration of Purpose

Westinghouse contends that, insofar as its purpose in promising to remove the spent fuel was to obtain value from it through reprocessing, that purpose has been completely frustrated by supervening events.
*460 The defense of frustration of purpose, like commercial impracticability and mistake of fact, is limited by the parties' allocation of the risk that the supervening event will occur. See Corbin, Contracts, § 1354 (1964). Having found overwhelming evidence that Westinghouse assumed the risk of the uncertainties of reprocessing, the Court cannot find that frustration of purpose excuses its nonperformance.
Additionally, it is to be noted that while in the narrow sense, Westinghouse's purpose in agreeing to remove the spent fuel was to reprocess it, Westinghouse's broader purpose was to secure the Florida contract. The Court has found that Florida would not have agreed to a contract which required it to reprocess the fuel, or which gave it responsibility for the spent fuel after the "cooling off" period. Knowing this, Westinghouse agreed to remove the fuel; and by so doing, it did indeed achieve its larger purpose of obtaining the Florida contracts for the construction of two nuclear steam supply systems. That its accomplishment in this regard may now be viewed by it as a commercial tragedy is unfortunate, yet one cannot but conclude that Westinghouse is to a great extent the architect of its own misfortune.

V. Relief

As the Court has previously noted, Florida has already been financially damaged in an amount in excess of nine million dollars, and any relief must, of course, call for reimbursement, at least to that extent. There has been some evidence to the effect that other utilities have been considering the construction of interim spent fuel storage facilities. The estimates of the cost of such facilities, depending on the site and capacity, range from 20 million dollars to 44 million dollars. Estimates of the cost to construct a storage facility, if one can be constructed, at the Turkey Point site, are in excess of 33 million dollars, with a further annual cost of approximately one million dollars.
In addition to monetary damages for expenses incurred thus far in storing the spent fuel, Florida seeks an order requiring Westinghouse to specifically perform its promise to remove the spent fuel. Westinghouse contends that Florida is not entitled to a decree of specific performance under Florida law on the following grounds: (1) that Florida has not shown that monetary damages would be an inadequate remedy; (2) that Westinghouse cannot be ordered to remove the spent fuel because its performance necessarily depends on the cooperation and assent of third parties (specifically, government agencies which regulate the nuclear industry), and (3) specific performance is inappropriate in light of the difficulty of fashioning a specific and workable decree, and of monitoring the parties' compliance therewith over the long term.
Under Florida law, specific performance is often said to lie within the "sound discretion" of the Court. Buck v. McNab, 139 So.2d 734 (Fla.App.1962). It is discretionary in the sense that the Court may,  indeed, in many cases, must  make judgments based on equitable considerations. However, it is not "discretionary" in the sense that the Court's power is relatively unlimited:
By saying that the exercise of discretion must be `sound' and `judicial', the courts should be understood as meaning that there are reasonably well established working rules and standards by which they are governed in granting and refusing the remedy.
Corbin, Contracts, § 1136. Because the Court does not possess current information as to a number of crucial factors bearing on the appropriateness of a decree of specific performance, and, more importantly, because it wishes to provide the parties an opportunity to reach agreement as to how Westinghouse's duty may best be discharged, it does not now decide which of the remedies available to it should be applied here. The Court deems it appropriate, however, to discuss briefly the factors relevant to the selection of a remedy in the hope that the Court may assist the parties in reaching agreement, or, if such should prove necessary, that the parties may better *461 assist the Court by providing evidence bearing on the matter as expeditiously as possible.
Specific performance may be warranted where the plaintiff cannot be adequately compensated by an award of damages. City Stores Co. v. Ammerman, 266 F.Supp. 766 (D.D.C.1967). Here, there is considerable uncertainty as to Florida's future damages. Its estimate as to the expense it will have to incur should it be forced to shut down its plant in 1985 is just that  an estimate. Given the volatility of the price of all forms of energy, its actual expenses may vary considerably from this projection. Florida will, if the spent fuel is not removed, doubtlessly suffer very large future damages as a result of Westinghouse's breach. While this uncertainty would not be sufficient to defeat a damages claim, Twyman v. Roell, 123 Fla. 2, 166 So. 215 (1936) the uncertainty of the estimate is to be noted as one factor tending to militate in favor of specific performance. A further uncertainty arises from the probable difficulty of Florida obtaining from another party performance substantially similar to that promised by Westinghouse. The Court does not have information concerning the current availability of storage facilities or the present government regulations and policies concerning transportation of spent fuel. At trial, there was evidence that it would be extremely difficult, if not impossible, for Florida to obtain a contract for removal by another party. To the extent that this remains true, it may be viewed as another factor favoring specific performance.
By the same token, however, the very factors which might render it difficult for Florida to contract for removal with a third party would, obviously, make performance by Westinghouse difficult. While the Court has concluded that Westinghouse's nonperformance is not excused by commercial impracticability, this is not to be construed as precluding the Court from giving consideration to the hardship of performance in deciding the question of remedy. There are "[f]acts that are not sufficient to invalidate a contract and that may nevertheless be sufficient to induce the refusal of a decree for specific enforcement". Corbin, Contracts, § 1162.
Finally, while the Court is fully cognizant of the difficulty of fashioning a sufficiently specific decree should the parties be unable to reach agreement, and should the Court conclude that specific enforcement is appropriate considering the various other factors, the Court believes that, with the assistance of the parties, a workable and appropriate decree would be achieved.
The Court, however, fervently hopes that it will not be called upon to draft a decree, not because it would be difficult, but rather because the Court is convinced that the parties themselves are in a far better position to find an equitable solution. The future of nuclear energy is a political question upon which the Court expresses no view. Resolution of the issue may or may not assist the parties in reaching an agreement. Regardless, however, of the government's present or future policies and actions vis-a-vis nuclear power, it is clear that, under the law, Westinghouse is liable to Florida for its breach of contract. It must pay damages, or perform, or some combination thereof, whether by agreement of the parties or by order of the Court. The former is, in the Court's view, far preferable in light of the parties' greater ability to discern the best interests of both Florida's ratepayers and Westinghouse's shareholders, and their greater experience in solving complex practical problems.
The Court is not without some perspective as to the willingness and ability of the parties, with the assistance of the Court, to reach a fair agreement. Westinghouse has, in a series of cases which the multi-district panel transferred to this court along with the instant case, evidenced its good faith and willingness to work toward fair and equitable solutions of myriad complex problems. The agreements reached were, in the Court's view, beneficial to the parties and the public as well. Plaintiff, too, has shown its good faith as evidenced by the fair solution *462 reached in another aspect of the instant case.
The solutions to which this Court makes reference were reached after all parties, through their respective counsel, fairly, fully and vigorously litigated the issue of liability. The Court is satisfied that no less a result may be attained here. In the event, however, that the Court's hope in this regard does not reach fruition, then the parties may present further evidence on the issue of specific performance, as well as evidence in reference to a fair monetary award. As mentioned supra, there is considerable uncertainty in the present record as to Florida's future damages. Further evidence will be necessary, to the end that Westinghouse pay no more, and Florida receive no less, than is fair.
Therefore, the parties will be granted ninety (90) days within which to attempt to reach agreement as to the form of the decree to be entered in this matter. Should they wish additional time, the Court may be willing to grant it, upon a showing that additional time would be productive.
In the interim, the Court will meet and confer with counsel, in an effort to assist them in reaching agreement, and for the purpose of more fully apprising the parties as to the further information which the Court deems necessary to draft an appropriate decree in the event that the parties fail to reach an agreement. At such a meeting the parties should be prepared to render assistance in the selection of an expert for the purpose of assisting the Court, should the Court conclude that such assistance is necessary, in ascertaining the various alternatives, if any, leading to the removal and storage of the spent fuel.
In view of the fact that the interests of both parties and the public would best be served by an expeditious and final resolution of this matter, both parties are urged to use the initial time period in an intensive attempt to reach agreement, rather than in preparing to further litigate the issue of remedy.
An appropriate order shall issue.
NOTES
[1] A letter dated September 2, 1975 from John Rolin of Westinghouse to J. E. Carson of Florida reads as follows:

Westinghouse shares the concern, expressed in your letter of June 10, 1975, regarding the removal of spent fuel from Turkey Point. The schedule for removing and reprocessing the Turkey Point discharged fuel is, of course, dependent on the Allied-General Nuclear Services (AGNS) reprocessing facility schedule. Although Westinghouse has had recent discussions with AGNS, major uncertainties still exist which make it impossible to establish the long-range plans you inquired about.
At this time, therefore, Westinghouse has no plans for removing the spent fuel from the Turkey Point site. We will keep you informed as to any changes in this situation.
. . . . .
[2] Irradiated fuel is fuel which has been used or spent in a reactor core. The fuel is contained in assemblies, see n.3, and stored, for purposes of cooling, in water filled storage pits, prior to being moved from the site.
[3] A brief description of the fuel cycle follows.

Enriched uranium in a gaseous state is transported in cylinders to a fabrication facility where the fuel is fabricated into fuel assemblies, which among other processes, consists of converting the enriched hexafluoride to a ceramic powder known as uranium dioxide, which is then pressed into pellets typically ¼ of an inch to ½ inch in diameter, and approximately ½ to 1 inch in length. These pellets are then placed into long, thin-walled rods of a length of 12½ or 13 feet with a diameter of approximately ½ inch.
These rods in turn are then placed in a square-pitch array consisting of a precise number of rods in a precise number of rows. The rods are held together structurally by grids at 6 or 7 axial locations along the 12 foot high assembly. These assemblies are then, during reactor refueling, placed in a vessel designated as a reactor core assembly.
In the instant case, 157 fuel assemblies are contained in the reactor core of each unit, and currently 40 spent fuel assemblies are generated each year by each of Florida's reactors.
The initial core of a reactor consists of all new or fresh fuel assemblies, as contrasted with a reload core wherein only a portion of the fuel assemblies are fresh.
Experience has shown that the most economical utilization of nuclear fuel has been to change only a portion of the assemblies at each refueling. The removed or spent fuel assemblies are then usually placed in water storage pools.
Contained in these spent fuel assemblies is not only much uranium, but plutonium as well, which is recovered during the reprocessing procedures.
[4] Irradiated, or spent fuel contains valuable fuel material. After the spent fuel has cooled for three or four months, it is loaded underwater into heavily shielded casks. These leadlined casks are used to transport the fuel to a chemical reprocessing plant. At the reprocessing plant the fuel is unloaded into another underwater storage pool.

The first step in reprocessing is to transfer the fuel from the storage pool to a cell where the assembly can be mechanically disassembled. After the end fittings have been removed, the fuel rods are sheared into short pieces. These pieces are placed in a dissolver where nitric acid selectively dissolves the fuel and leaves the cladding. The resultant fuel-bearing acid solution is treated by solvent extraction to separate the uranium and plutonium from the fission products. The uranium and plutonium are then subjected to further solvent extraction steps to purify them and remove nearly all of the fission products. Final products of the reprocessing are uranium and plutonium nitrate solutions.
[5] The parties ultimately agreed to a rate of 1.7 mills for each kilowatt hour of electricity generated, which was the basis for fuel payments by Florida, as calculated by Westinghouse, without specifically relating to Florida the components encompassed therein.
[6] The contract called for a 10% ceiling on an escalated scale until October 21, 1977 in reference to Turkey Point Unit 3 and a similar one until June 12, 1978 as to Turkey Point Unit 4.
[7] Reference to reprocessing is contained in options A and B, which were not selected by Florida.
[8] An internal document of Westinghouse designated as its Atomic Power Division Five Year Business Plan, dated May 1966, contains the following statement which the Court views as buttressing its conclusion that Westinghouse deliberately accepted risks premised on assumptions, not under its control, in order to secure the nuclear plant contract with Florida:

1. Long Term Fuel Contracts
APD is evaluating in detail the desirability of promoting and/or acceptance of long term fuel contracts, including the supply of uranium. The basic APD position, to date, has been to quote these contracts only if it appeared to be a necessary condition for obtaining a nuclear plant award. This "somewhat negative" approach is now under review by APD. The approach followed in the past was adopted in order to minimize risk, and to have a customer's decision to buy or not buy from Westinghouse based on factors under our control. With the broader scope, APD could win or lose a job because of assumptions made relative to the cost of uranium, toll enrichment, reprocessing, etc., items of cost not under Westinghouse control.